Irene **LUCERO**, Appellant,

v.

Thomas **W. DONOVAN** et al., Appellees.

No. 19515.

United States Court of Appeals
Ninth Circuit.

Nov. 23, 1965.

Rehearings Denied Jan. 14, 1966.

---

Hillel Chodos, Glikbarg & Chodos, Beverly Hills, Cal., for appellant.

Roger Arnebergh, City Atty., Bourke Jones, Asst. City Atty., Wm. B. Burge, Deputy City Atty., Los Angeles, Cal., for appellees.

Before BARNES, DUNIWAY and ELY, Circuit Judges.

ELY, Circuit Judge:

This appeal is from a judgment which followed a directed verdict in favor of defendants in the court below. Irene Lucero, the appellant, brought her suit under the provisions of the Civil Rights Act of 1871, Rev.Stat. § 1979 (1875), 42 U.S.C. § 1983.[1] The defendants are two policewomen and two peace officers of the police department of the City of Los Angeles, California, Delia Florez Buczek, Madeline Cobb, Robert Conrad, and Richard Wells.[2] The transcript of testimony discloses the controlling facts, as follows:

On October 4, 1960, while defendant Conrad and another policeman, one Donahue, were patrolling in an automobile, they observed Frank Lucero, brother of the plaintiff.[3] In his testimony, Conrad described Frank as a "male Mexican" and stated that his "eyes were in a fixed stare forward and he was shuffling along, dragging his feet, walking very slowly. And he appeared to be swaying from one side to the other as he was walking." Frank was stopped by the officers, who, being in plainclothes, identified themselves. They then questioned Frank, asking whether he was under the influence of narcotics and whether he used or possessed narcotics, all of which Frank denied. Conrad testified that Frank told him that he was on parole, that he had just that morning gotten out of jail, and that he lived at 1135 Irolo Street. Conrad testified that he then

---

1. "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person with the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

2. This is the second time that this case has been before us. In Lucero v. Dono-

van, 300 F.2d 441 (9th Cir. 1962), in a per curiam decision, the action was remanded to the District Court for further consideration in the light of Cohen v. Norris, 300 F.2d 24 (9th Cir. 1962).

Thomas W. Donovan, whose name appears in the style of this case, is no longer a party to the suit, having been named originally because of a mistake in identity.

3. Neither Officer Donahue nor Frank Lucero were within the jurisdiction of the court for the purposes of this suit.

asked Frank, "You don't mind if we search [your residence]? And he [Frank] said no." Conrad, Donahue, and Frank then proceeded to 1135 Irolo Street which was, in fact, the residence of another sister, Mrs. Emily Ruiz. Conrad testified that Frank was not under arrest, although he stated that he was not certain that Frank could have simply walked away. When the police arrived at the Ruiz residence, Mrs. Ruiz denied that Frank lived there. Conrad testified that she said that Frank lived with his other sister, the plaintiff, on Fedora Street, but Mrs. Ruiz testified that she stated only that Frank lived "in Santa Monica." A special interrogatory, "Did Mr. and Mrs. Ruiz on the 4th of October, 1960 at their apartment state in substance to defendant Robert Conrad that Frank Bernard Lucero lived with his sister Irene Lucero at 1321 Fedora, in the City of Los Angeles?" was not answered, the jurors finding themselves in disagreement. There was a conflict in the testimony as to whether the Ruiz's apartment on Irolo Street had been searched.

After leaving the Ruiz's apartment, defendant Conrad, Donahue, and Frank proceeded to plaintiff's apartment on Fedora Street. Upon arriving there defendant Conrad and Donahue, with Frank, entered the apartment, and the officers commenced a search. Plaintiff was in the bathroom, bathing her two small children, when she looked around and discovered the presence of her brother Frank and a "strange" man (defendant Conrad). She testified that she spoke to Frank, who was instructed by Conrad to remain silent. She then noticed Donahue searching her bedroom. Her testimony was that she demanded a search warrant, asserting that she knew her rights, and that the only response was that of Conrad whose reply to plaintiff, a natural born citizen of this country, was, "go back to Mexico." Conrad admitted that plaintiff demanded

the production of a search warrant, and he added that she "started hollering and cursing at us, calling us gestapo, Nazi gestapo, and so forth." At this point plaintiff was arrested and handcuffed, and the search of the dwelling continued.

In the course of the search, defendant Conrad and Donahue discovered a brown bottle in the kitchen cabinet. It was unmarked and contained pink tablets, white tablets, and, as determined by the jury in answer to a special interrogatory and as described by Conrad, blue and yellow capsules.[4] Plaintiff testified that the bottle was found after she demanded the production of a search warrant. During the trial, Conrad testified that the bottle was found immediately upon his entering the apartment; however, in his deposition, taken prior to the trial, he indicated that the demand for a warrant was made before he entered the kitchen. After completing the search, Conrad and Donahue took plaintiff and Frank to the police station, bringing with them the bottle of pills. En route, the children had been taken to the home of Mr. and Mrs. Ruiz and left there. Conrad testified that his opinion was that the blue and yellow capsules found in the unlabeled bottle contained narcotics and that he formed this opinion because he recalled capsules of a similar description being displayed on a chart at the police station. Plaintiff insisted that the bottle contained vitamin tablets and nothing else. A subsequent police analysis verified that its contents were not prohibited drugs.

Plaintiff and Frank were interviewed, separately, by Sergeant Loeber, the supervisory officer in charge of the Narcotics Division of the Los Angeles Police Department, who also examined the pills and compared them with those shown on the display chart in the Narcotics office. According to him, the comparison revealed a resemblance to a nonnarcotic drug. Frank was released, but Loeber advised Conrad that plaintiff should be

4. The plaintiff testified that the bottle contained no capsules. All of the bottle's contents had apparently been misplaced while in police custody and could not be produced at the trial.

booked for a felony violation of the Narcotics Act, even though it was his opinion that the blue and yellow capsules did not contain any narcotic substance. It was his opinion that plaintiff was probably guilty of a violation of § 4230 of the Business and Professions Code of California (possession of a dangerous drug), a misdemeanor, but pursuant to that which he described as a "policy" of the Los Angeles Police Department, plaintiff should be booked on a felony charge.

Plaintiff was then taken to the Lincoln Heights Receiving Hospital and treated for injuries received while resisting arrest. No search of her person was made by medical personnel who may have attended her there. Thereafter, she was taken to the fifth floor of the Lincoln Heights Jail, the Women's Booking Section. While she was being booked by defendant Wells, she was "frisked" by defendant Buczek. Policewoman Buczek testified that the "frisk" consisted of her looking in plaintiff's brassiere for concealed weapons and, with her hands, quickly going over the plaintiff's body and between her legs to make sure that she had no obvious weapon concealed about her body. Then defendant policewomen Cobb and Buczek led plaintiff to an area in the back of the interview room. They asked plaintiff to remove her clothing and submit to a visual search by defendants Buczek and Cobb of her bodily cavities. Plaintiff refused to submit to this requested search. Defendant Buczek testified,

"And I advised Miss Lucero, went through the same procedure, advising her she would have to remove her clothing, that after she removed her clothing she was going to have to squat down a number of times, after she squated [sic] down then she was going to then have to give her back to us and from the waist down to bend forward with her legs spread apart and she was going to have to bring her hands from behind and open up her buttocks so we could make a visual observation."

Plaintiff remained unpersuaded by defendant Buczek and forcefully resisted the policewomen's attempts to undress her. Defendants Wells and Conrad and police officer Donahue were then summoned by one of the policewomen to assist. Wells entered the room first. There is a conflict in the testimony as to what next occurred. Defendant Buczek testified that she informed plaintiff that if she would remove her clothing, Wells, the male police officer, would leave the room. Plaintiff testified that she had removed her shoes and capri pants herself and that she refused to undress further, protesting that she was unwilling to submit to a visual search of her privates because she was having her monthly period. A doctor is on duty at all times at the police station, and plaintiff testified that she had expressed willingness to submit to examination by a doctor. She further testified that when the male officers entered the room she then offered to remove the rest of her clothes herself if only the male officers would leave. Defendants could recall no such statement. They insisted that plaintiff removed none of her clothing herself and that the clothing was removed by the policewomen while plaintiff was being held by the neck and arms by the male defendants Conrad and Wells. Defendants testified that the male officers left immediately after plaintiff's clothes were removed. Plaintiff testified that the policewomen and Wells left the room but that Conrad and Donahue remained for a short time and made deprecating remarks about plaintiff's nude body as she lay, weeping, on the floor. Plaintiff was released from jail the next morning. No charges were filed.

■ Generally expressed, "The only elements which need to be present in order to establish a claim for damages under the Civil Rights Act are that the conduct complained of was engaged in under color of state law, and that such conduct subjected the plaintiff to the deprivation of rights, privileges, or immunities secured by the Constitution of the United States." Marshall v. Sawyer,

301 F.2d 639, 646 (9th Cir. 1962). Here, it cannot be denied that defendants were acting under "color of state law." The issue is whether there was "deprivation of rights, privileges, or immunities secured by the Constitution [or laws] of the United States."

Plaintiff alleged that her constitutional rights were infringed by: (a) the search of her apartment; (b) the seizure of her vitamin pills; (c) her arrest; (d) her handcuffing; (e) her detention during interrogation; (f) her imprisonment at the city jail; (g) the search of her person at the city jail; and (h) her subsequent detention. She sought general damages for humiliation, embarrassment, anxiety, and extreme mental and emotional duress. She also prayed for exemplary damages.

At the close of the evidence the trial court submitted two special interrogatories to the jury. They were,

1. "Were there blue and yellow capsules in the bottle found in the residence of Miss Irene Lucero by defendant Robert Conrad on the 4th of October, 1960?" (Answer: Yes.)

2. "Did Mr. and Mrs. Ruiz on the 4th of October, 1960 at their apartment state in substance to defendant Robert Conrad that Frank Bernard Lucero lived with his sister at 1321 Fedora, in the City of Los Angeles?" (No answer, the jury reporting disagreement.)

It is clear, from the interrogatories submitted and the subsequent direction of a verdict upon the basis of the one answer that the trial court believed that the plaintiff could recover only if there were no probable cause for her arrest and that probable cause existed because there were blue and yellow capsules in the bottle found in plaintiff's apartment. We do not agree.

The plaintiff recited three events, any one of which, if it occurred as alleged, could have entitled her to relief. If the search and seizure at her apartment were unlawful, liability could follow, as against Conrad, for the entire chain of events which, in continuous and unbroken sequence, followed his unlawful act. If the search and seizure at the apartment were lawful, but the arrest unlawful, then liability could follow, as to Conrad, for the arrest and the events which followed in legally unbroken sequence. And if only the search at the police station amounted to a deprivation of plaintiff's federal rights, privileges, or immunities, then recovery might properly rest upon that deprivation. Thus, all grounds upon which the suit was based would not necessarily be eliminated by plaintiff's failure to prove the absence of probable cause for her arrest.

█ The search and seizure at plaintiff's apartment were not conducted pursuant to the authority of warrant. It was not contended, nor could it have been contended successfully, that the search and seizure were justified as being incident to the arrest of Frank, if in fact he was under arrest. They were too remote in time and place. See, e. g., Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964); Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925). It follows that the search of the apartment and the seizure of the bottle were unlawful absent a determination that there was a valid consent therefor. See, e. g., Stoner v. State of California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964).

On the matter of consent, our court has held that whether consent has been given is a question of fact for the trial court to determine. United States v. Page, 302 F.2d 81 (9th Cir. 1962). The circumstances surrounding Frank's "consent" were such that they might well justify a finding that there was no consent at all.[5] He was, if not under arrest,

---

5. "The government must prove that consent was given. It must show that there was no duress or coercion, express or implied. The consent must be 'unequivocal and specific' and 'freely and intelligently given'. There must be convincing evidence that defendant has waived his rights. There must be clear and positive

being detained by the police. He first led the police to another apartment, falsely stating it to be his residence, before he was taken to plaintiff's apartment. That he was truly a resident there is doubtful, although the evidence would seem to establish that he had been a welcome visitor from time to time. See Castaneda v. Superior Court, 59 Cal.2d 439, 30 Cal.Rptr. 1, 380 P.2d 641 (1963), in which, under similar circumstances, the Supreme Court of California concluded that no consent had been given.

■ Assuming that Frank gave his own consent for search of the apartment, his authority, if any, to act for his sister was rescinded by her expressed protest and her demand for a search warrant. See Tompkins v. Superior Court, 59 Cal.2d 65, 27 Cal.Rptr. 889, 378 P.2d 113 (1963). If the protest occurred before discovery of the bottle, the subsequent search for it and its seizure were unlawful. If the protest did not occur until after the pills were discovered, there would yet be the need to determine, in the light of the peculiar circumstances, the validity of any consent which Frank is claimed to have granted for the search of his sister's home. See Stoner v. California, supra;[6] Cunningham v. Heinze, 352 F.2d 1 (9th Cir. 1965).

■■ Should it be determined that the original search and seizure were lawful, we conclude, on the basis of the present record, that there was no probable cause for the arrest. In an appeal from a directed verdict, the evidence must be viewed in the light most favorable to appellant. See Wilkerson v. McCarthy, 336 U.S. 53, 57, 69 S.Ct. 413, 93 L.Ed. 497 (1949); Necaise v. Chrysler Corp., 335 F.2d 562, 567 (5th Cir. 1964); Wells v. Warren Co., 328 F.2d 666, 668–669 (5th Cir. 1964). The finding of blue and yellow capsules in an unmarked bottle in plaintiff's kitchen cabinet is not a circumstance "sufficiently strong to warrant to a reasonable man the charge is true." People v. Tyler, 193 Cal.App.2d 728, 733, 14 Cal.Rptr. 610, 613 (1961), cert. denied, 370 U.S. 905, 82 S.Ct. 1252, 8 L.Ed.2d 401 (1962); see also, e. g., Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); Varon, Searches, Seizures and Immunities 81 & nn.13 & 14 (1961). Surely, many respectable persons need look no further than their own medicine chests to find a potpourri of pills in an unmarked bottle, transferred from the original containers for one innocent reason or another. Without more, this can hardly furnish adequate probable cause for arrest without warrant.

■ Even if it should be conceded that the search of the apartment, the seizure of the bottle, and the arrest of plaintiff were lawful, there is a serious question as to the reasonableness of the conduct of the defendants thereafter. Although a search may be authorized, it may not be pursued in a manner which violates the Constitution's requirement that *all* searches must be reasonable. U.S.Const. amends. IV & XIV; United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950). In the

---

testimony. ' "Courts indulge every reasonable presumption against waiver" of fundamental constitutional rights'. Coercion is implicit in situations where consent is obtained under color of the badge, and the government must show that there was no coercion in fact. The government's burden is greater where consent is claimed to have been given while the defendant is under arrest." United States v. Page, supra, 302 F.2d at 83–84 (Footnotes omitted.).

6. In Stoner, the Supreme Court held that evidence obtained during a search of a hotel room, entry to which was gained through the co-operation of a hotel clerk, was inadmissible, though the officers in good faith believed that the hotel clerk had authority to give the consent. "It is important to bear in mind that it was the petitioner's constitutional right which was at stake here, and not the night clerk's nor the hotel's." 376 U.S. at 489, 84 S.Ct. at 893. This case seemingly overrules People v. Gorg, 45 Cal.2d 776, 291 P.2d 469 (1955), strongly relied upon by appellees. The Gorg case held that a search made after the consent of a third person, whom the officers in good faith reasonably believed had authority to consent, is valid.

light of the evidence as to the manner in which the search of plaintiff's body was conducted and the circumstances which attended it, the question should, under appropriate instructions, have been resolved by the jury.

Plaintiff's appeal also specifies certain alleged errors relating to discovery, the reception of evidence, and the conduct of the trial. We find it necessary to discuss but two of these points.

■ The first is the claim of improper receipt of certain testimony and exhibits. On cross-examination defendants undertook to question plaintiff concerning a scar on her arm. The arm had been photographed in 1959 while plaintiff was under arrest. The trial judge properly sustained objection to the inquiry. Plaintiff, however, apparently believing that the inquiry itself created an unfair inference that she was a user of narcotics, explained that the scars were the result of extensive blood tests taken while she had been hospitalized for a liver ailment. Defendants, contending that they were attempting to impeach the explanatory testimony, produced an expert witness who had been present during the 1959 detention. Over objection, the expert was permitted to express his opinion that plaintiff had been a user of narcotics. This evidence was prejudicial and should have been rejected. It unnecessarily injected a collateral issue, it was not true impeachment, and as developed, it was insufficiently relevant.

■ Defendants were also permitted to inquire of plaintiff as to whether or not she had been married to the father of her children. The status of plaintiff's children had no relevance to the issues. Had the question been answered in the negative, the answer should not have justly tended to lessen damages for that which might have been found to be abusive deprivation of constitutional rights.

Even women who have surrendered to temptation and the seducer's guile are entitled to these. If the evidence had any relevance whatsoever, it was of such slight effect as to be outweighed by decent considerations of public policy.[7] Plaintiff's children were not parties to the litigation, and the court should have promptly and firmly terminated tactics which might have led, uselessly, to lasting taint upon their dignity.

Reversed and remanded.

---

7. Courts have recognized that it is sometimes desirable that such evidence, even though it may be relevant, should be excluded "where the minute peg of relevancy will be entirely obscured by the dirty linen hung upon it." United States v. Kahaner, 317 F.2d 459, 472 (2d Cir. 1963); cert. denied 375 U.S. 836, 84 S. Ct. 74, 11 L.Ed.2d 65 (1963); State v. Goebel, 36 Wash.2d 367, 218 P.2d 300, 306 (1950); see McCormick, Evidence 333 n. 28 (1954).