UNITED STATES of America,
Plaintiff,

v.

Gerald Arlington POOLE, III, Defendant.

Crim. No. 31900.

United States District Court
E. D. Louisiana,
New Orleans Division.

Dec. 31, 1969.

George P. Hand, Jr., Asst. U. S. Atty., New Orleans, La., for plaintiff.

Robert J. Skinner, New Orleans, La., for defendant.

ON MOTION BY DEFENDANT
TO SUPPRESS EVIDENCE

CASSIBRY, District Judge:

The defendant is charged in three counts of an indictment with unlawful possession of a 12-gauge, Model 94 F Stevens "sawed-off" shotgun, by reason of his failure to comply with certain sections of the United States Code con-

cerning registry, payment of taxes, and the necessity for a serial number. 26 U.S.C.A. §§ 5861(c), 5861(d), 5861(i), and 5871. The defendant has filed a motion to suppress the shotgun, ammunition and any other physical evidence seized by police from defendant's "overnight bag" while he was staying at certain premises in Metairie, Louisiana. The motion was heard on December 3, 1969. For the reasons discussed below, the motion to suppress is granted.

The facts are as follows. Deputy Raymond Lefevre of the Jefferson Parish Sheriff's office testified that a New Orleans detective contacted him and advised him that he suspected[1] that Charles Dickson, owner of the premises involved in this case, possessed at his apartment stolen checks and money orders. In response to this call, two New Orleans detectives, together with Deputy Lefevre and another Jefferson Parish deputy, proceeded to Dickson's apartment. The officers had neither a search nor an arrest warrant. Lefevre testified that the officers did not attempt to obtain a search warrant because they felt they had no "probable cause" sufficient to justify a search warrant. The police knocked at the door and Dickson answered. It was 1:15 A.M. Lefevre allegedly told Dickson that he was looking for stolen checks, that he did not have a search warrant, and that he (Dickson) would be within his rights in refusing to permit a search.[2] Dickson allegedly told Lefevre to proceed with the search, commenting that he had nothing to hide. Deputy Lefevre's testimony concerning what Dickson said was objected to by counsel for defendant as hearsay. The objection was overruled.

On cross-examination Deputy Lefevre testified that he knew the defendant Poole was staying in the apartment at the time of the search but that he had no information from any source, nor

any reason to suspect, that Poole had committed a crime. The front door of the apartment opens into a living room; the rest of the apartment consists of a back bedroom and a kitchen. When the police entered and advised Dickson of his rights Poole was not present in the living room. The police found him in the bedroom with a girl named Sheri[3] and brought them both out to the living room before commencing the search. Lefevre testified that he did not advise Poole that he had any right to object to the search since the apartment was Dickson's, not Poole's. The testimony of the other officers was substantially similar to that of Deputy Lefevre.

Poole testified that he arrived in New Orleans from Texas on July 5, 1969 and went to Dickson's apartment where he had permission to spend the night as a guest; that his only luggage was an overnight bag which he placed in the hall closet; that he was not aware of anyone in the apartment other than Dickson and the girl until he heard voices outside the bedroom door. He was brought to the living room and was not advised of any right to object to a search. Indeed, Poole claimed that no one ever said in his presence that there was going to be a search. He testified that he was afraid and also that his liberty was curtailed. As he attempted to move from a sofa to the closet where his overnight bag lay, an officer told him to stay where he was. It is perhaps more than coincidence that the first place the officers mentioned in their account of the search was the very closet toward which Poole had attempted to move. There they found the overnight bag. It was unzipped, and the gun, bullets and other evidence sought to be suppressed removed. Prior to unzipping the bag no officer made any attempt to ask whose it was. The evidence does not disclose whether the bag was labeled.

---

1. The basis of this suspicion was not revealed by any of the officers involved.

2. The police knew that Dickson was the owner of the apartment because Lefevre

worked as a house detective in the same apartment building in off-hours.

3. Poole later identified Sheri as Dickson's wife.

## I.

█ As pointed out, the search was conducted without a warrant, and the Government rests its case wholly on Dickson's alleged consent to the search. Even assuming, however, that the Government has sustained its high burden of proof in such cases to show by clear and convincing evidence that the consent was freely and voluntarily given,[4] Dickson's

The question whether the Government has met this high burden of proof in this case is not free from doubt. The only persons who testified to Dickson's alleged consent were the police officers. Dickson was not called by either side. There is a possibility that the defense was unaware that the Government intended to justify the search on the basis of consent. Poole was not present when the consent was allegedly given and claimed at the hearing that he was unaware that Dickson had consented to a search. It is possible that he learned of the alleged consent for the first time at the hearing. Even assuming, however, that Dickson *verbally* consented, the circumstances surrounding the consent leave something to be desired: Dickson was on probation and the police knew it; suddenly, at 1:15 in the morning, Dickson is confronted by four policemen who say they are looking for stolen checks and ask to search; Dickson supposedly then invites them to search saying he has nothing to hide. But Dickson's "consent" may have been "false bravado" rather than a true waiver. He knew that the police knew that he was on probation, and might have feared that he would be "in trouble" if he gave an appearance of guilt. In similar circumstances courts have held that the Government has not sustained its high burden to show the consent was free from coercion or duress. In Channel v. United States, 285 F.2d 217 (9th Cir. 1960), for example, where the defendant told the police "I have no stuff in my apartment and you are welcome to go search the whole place," the court held the consent invalid:

> "In neither case was there any specific statement by the defendant that the search could be made without a warrant. If this element may be supplied by inference it could be said that since consent was not needed to search with a warrant, Channel must have intended to permit a search without warrant. But an equally permissible inference, as the court points out in Judd, is that the words were not designed to give consent at all but only evidenced false bravado. In view of this choice of inferences it cannot be said that the consent to search without a warrant was specific and unequivocal." Channel, supra, at 220.

A further factor is that the police found the very items which they told Dickson they were searching for. Some courts have held that consent in such circumstances must be made under compulsion, since the consenter knows that evidence of his guilt will be discovered. In a case where the police told defendant they thought he was engaged in the narcotics trade, and defendant denied guilt and told the police they could look anywhere in the room they wanted to, the court said:

> "Words or acts that would show consent in some circumstances do not show it in others. 'Non-resistance to the orders or suggestions of the police is not infrequent * * *; true consent, free of fear or pressure, is not so readily to be found.' Judd v. United States, 89 U.S.App.D.C. 64, 66, 190 F.2d 649, 651. If a valid confession precedes a search by police, permission may show true consent to the search. That was the situation in United States v. Mitch-

---

4. "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." Bumper v. North Carolina, 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968).

"A search and seizure may be made without a search warrant if the individual freely and intelligently gives his unequivocal and specific consent to the search, uncontaminated by any duress or coercion, actual or implied. The Government has the burden of proving by clear and positive evidence that such consent was given." Channel v. United States, 285 F.2d 217, 219–220 (9th Cir. 1960).

"Searches and seizures made without a proper warrant are generally to be regarded as unreasonable and violative of the Fourth Amendment. True, the obtaining of the warrant may on occasion be waived by the individual; he may give his consent to the search and seizure. But such a waiver or consent must be proved by clear and positive testimony, and it must be established that there was no duress or coercion, actual or implied. * * * If the Government alleges [the absence of duress and coercion], it has the burden of convincing the court that they are in fact absent." Judd v. United States, 89 U.S.App.D.C. 64, 190 F.2d 649, 650–651 (1951).

consent cannot validate the search of *Poole's* overnight bag in the circumstances of this case. True, in certain circumstances courts have upheld consent searches where the objects seized belonged to someone other than the person who gave the consent. In United States v. White, 268 F.Supp. 998 (D.D.C. 1966), for example, O'Neal consented to an FBI search of his photography lab-apartment which the defendant, who worked for O'Neal, occasionally used as sleeping quarters. The FBI agent who conducted the search testified that he observed blood stains, liquor bottles and glasses, coins scattered on the floor, loose papers, bullets "in full view on top of an open satchel" (268 F.Supp. 998, 1000), etc. Photographs were taken and certain items seized and removed from the premises. None of the items observed or seized were in any part of the apartment devoted to defendant's exclusive use, nor were they in any closed container which belonged to the defendant. In upholding the search the court distinguished cases " * * * where a third party consents to the search of areas *specifically set aside* for the use of the defendant or to the search of *his personal effects * * *.*" White, *supra*, at 1001–1002. (emphasis the *White* court's).[5]

As the quoted language from *White* indicates, courts have set aside consent searches where the place or thing searched was in the exclusive possession or use of the non-consenting defendant. United States v. Blok, 88 U.S.App.D.C. 326, 188 F.2d 1019 (1951) held that

a woman's supervisor could not validly consent to the search of a desk in a Government office which defendant had "exclusive right to use." In Cunningham v. Heinze, 352 F.2d 1 (9th Cir. 1965) the court, in remanding a case for an evidentiary hearing, strongly suggested that a landlady could not validly consent to a search of defendant's "room, closet and effects." In Reeves v. Warden, 346 F.2d 915 (4th Cir. 1965) the court held that the defendant's mother could not consent to a search of a room and bureau used exclusively by the defendant. In our own circuit the case of Holzhey v. United States, 223 F.2d 823 (5th Cir. 1955), is particularly relevant to the present case. Defendant's daughter and son-in-law allowed the FBI to search locked cabinets belonging to defendant in a garage below their apartment. Defendant claimed that she was allowed to live in the garage and therefore her daughter could not consent to a search of those premises. The trial court found from conflicting testimony that the mother did not live in the garage. Thus, under the apparent rule of some cases, she would not be able to object to the search of the premises since they were not in her exclusive control and possession but rather in that of her daughter and son-in-law. Nonetheless, even accepting this finding of fact by the trial court, the Court of Appeals reversed because uncontradicted testimony showed that the locked *cabinets* searched were owned by the defendant. Thus, this case seems almost squarely on point with the present one.[6]

ell, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140, on which appellee relies. But no sane man who denies his guilt would actually be willing that policemen search his room for contraband which is certain to be discovered. It follows that when police identify themselves as such, search a room, and find contraband in it, the occupant's words or signs of acquiescence in the search, accompanied by denial of guilt, do not show consent; at least in the absence of some extraordinary circumstance, such as ignorance that contraband is

present. No such circumstance is shown here."

Higgins v. United States, 93 U.S.App. D.C. 340, 209 F.2d 819, 820 (1954). See also United States v. Busby, 126 F.Supp. 845 (D.D.C.1954).

5. See also Rhodes v. White, 280 F.Supp. 285 (E.D.La.1968) ; Wade v. Warden, Maryland Penitentiary, 278 F.Supp. 904 (D.D.C.1968).

6. It is clear that the court was protecting the locked cabinets as such:

"There is authority for the proposition, argued by the Government, that the

## II.

The rule which emerges is that a defendant may object to a search consented to by another where the defendant has exclusive control over a part of the premises searched or over an "effect" on the premises which is itself capable of being (and is) "searched." "Enclosed spaces" over which a non-consenting party has a right to exclude others, whether rooms or effects, are protected. The reason for grounding the rule in proprietary rights is not entirely obvious. A search without a warrant presumptively violates the right of privacy of the victim. The theory of the consent exception is that a person may waive a constitutional right. How then can one person waive another's constitutional rights? If "the Fourth Amendment protects people—and not simply 'areas'—against unreasonable searches and seizures," Katz v. United States, 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed. 2d 576 (1967), it is no solution to the problem to simply say that the non-consenting victim does not own the premises searched. It is privacy, not ownership, that is protected. But the Fourth Amendment protects only *"reasonable* expectations" of privacy, see *Katz, supra,* at 361, 88 S.Ct. 507 (concurring opinion of Mr. Justice Harlan) (Emphasis added), and perhaps courts have made the social judgment that when a person leaves possessions in premises over which he has no control, or right to control, any expectation of privacy on his part is unreasonable. However if a room is set aside for a non-consenting party, and he does have a right to exclude others, a third party's consent to a search of this room would upset a reasonable expectation of privacy. The argument also applies to a searchable (enclosed) effect on the premises of another. If X leaves his closed suit case in Y's apartment, this is no authorization to Y to open the suitcase or for Y to allow others to open it. When Poole left his overnight

consent of the owner of the premises validates the search and seizure of the property of another found thereon, when the person whose property was seized had no superior legal right of possession to or dominion over the premises searched. See, for example, Calhoun v. United States, 5 Cir., 172 F.2d 457; Cutting v. United States, 9 Cir., 169 F.2d 951 [12 Alaska 143]. However, in such cases, it does not affirmatively appear that after gaining access to the premises through the consent of the owner, the searching officers broke into the locked personal effects of another.

"There is also authority to the effect that a person not in possession of the property searched or seized has no standing to question the legality of the search. United States v. Walker, 2 Cir., 190 F.2d 481, and authorities there cited. Compare the authorities cited in the annotation in 31 A.L.R.2d 1079.

"We think the instant case presents an issue which cannot be resolved by resorting to such generalities. The problem involved here is more analagous to the factual situation presented to the Court of Appeals for the District of Columbia in United States v. Blok, 88 U.S.App.D.C. 326, 188 F.2d 1019, wherein the search of an employee's desk with the consent of the employer was invalidated. After a careful review of the authorities, that Court held the employee's superiors could not reasonably search her desk for things which had no connection with the work of the office and that their consent could not make the search by officers reasonable. *We think the same reasoning applies here with respect to appellant's locked personal effects, and that the consent of the Williamses to the search of their premises did not and could not be extended to authorize the forceable entry and search of appellant's property.*

"No crime was being perpetrated in the presence of the agents, and there is nothing in the record to indicate any previous knowledge on their part that a crime had been committed. It is rather clear that the officers were engaged in a more or less exploratory search. If not, no reason appears for their not having obtained a search warrant or contacted appellant to seek her consent after they came upon the locked containers in the Williams home. We think the search made here was unreasonable, prohibited by the Fourth Amendment, and that the evidence obtained thereby should not have been admitted." Holzhey, supra, at 826 (Emphasis added).

bag in Dickson's closet with Dickson's permission, he had a reasonable expectation that Dixon or anyone else would not open that suitcase without Poole's permission. That reasonable expectation was upset by the search in this case. The police admitted that they had neither a search warrant nor probable cause for the search. As to Poole, they testified that they did not even have reason to *suspect* that he had committed any crime. In these circumstances Poole had a constitutional right to privacy which could not be waived by Dickson.

### III.

There is perhaps another rationale running through the cases dealing with consent as to third persons. Some judges apparently feel that as long as "consent" is allowed as a basis for search it should not be undercut by rules that are unworkable and place too heavy a burden on the police. The police might be deterred from employing consent searches altogether if the law requires them to ascertain the ownership or possession of any article or space on the premises searched. There is perhaps a sense in some cases that the police should have some notice that a room or article belongs to someone other than the person who appears to control the premises.[7] I do not now stop to examine carefully the validity of any such proposed rationale. Even assuming it is valid, I find that the police had ample notice that the rights of someone other than Dickson might be involved.

*First.* In some cases a person who turns out to be the ultimate victim of a search is not present when the search is made. If the non-present person is not the real object of the search the police

might not have notice that a particular item or room is his. In the present case, however, the ultimate victim of the search was present in the apartment. The police testified they knew he was there before they entered (it does not appear how they knew). Since it was late at night (1:15 A.M.) and Poole was found in the bedroom the police at least had reason to inquire whether Poole was staying at the apartment. They could have avoided an illegal search and protected Poole's rights by the simple expedient of informing him that he had a right to object to a search of any of his possessions present in the apartment. But the police failed to inform Poole of his rights or even of the fact of the search itself.

█ *Second.* Even though the police failed to inform Poole of his rights at the outset, they had a second chance to do so when they found the closed overnight bag in the closet. The fact that a guest was present in the apartment at this late hour coupled with the presence of an overnight bag should have suggested to a reasonable mind the possibility that the bag might belong to the guest. In these circumstances there was at least a duty to make some inquiry. See Holzhey, *supra*, at 826.

█ *Third.* Although the police had neither search nor arrest warrant for either Dickson or Poole, and no reason to suspect Poole of any wrongdoing, Poole's uncontradicted testimony states that when he attempted to move toward the closet where his bag was found he was told to stay where he was. The police had no legal justification to restrain Poole in such a fashion. If the police had at least asked Poole where he

---

7. See, e. g., Holzhey v. United States, 223 F.2d 823 (5th Cir. 1955). The police searched the defendant's locked cabinets located on the premises of another. The evidence did not unequivocally establish that the police knew that the cabinets were the defendant's, but it indicated that there was some notice of this fact:

"Even assuming, as implied by the agent's testimony, that the cabinet was not identified unequivocally as being the property of appellant, certainly the agents were put to some further inquiry as to its ownership * * *. At the very least, they knew [the consenting party] was disclaiming ownership of or authority over the cabinet." Holzhey, *supra*, at 826.

was going, he might have told them that he wanted to claim his bag in the closet. In these circumstances the police unquestionably would have had no right to search the bag without Poole's consent. Thus by their improper conduct toward Poole the police may well have prevented him from safeguarding his own rights.[8]

The defendant's motion to suppress is granted.

---

8. Of course the fact that the police actually found a shotgun in Poole's bag is irrelevant:

"Any idea that a search can be justified by what it turns up was long ago rejected in our constitutional jurisprudence. 'A search prosecuted in violation of the Constitution is not made lawful by what it brings to light * * *.' Byars v. United States, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520. * * *" Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968).