**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Stanley ROBINSON, Defendant-Appellee.**

**No. 73–1445.**

United States Court of Appeals, Seventh Circuit.

Argued May 25, 1973.

Decided June 5, 1973.

Rehearing Denied June 21, 1973.

Swygert, Chief Judge, dissented and filed opinion.

James R. Thompson, U. S. Atty., William T. Huyck, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellant.

Edward M. Genson, William J. Stevens, Chicago, Ill., for defendant-appellee.

Before SWYGERT, Chief Judge, and PELL and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

This is an appeal by the government under 18 U.S.C. § 3731 from the order entered May 15, 1973 granting defendant's motion to suppress certain items named in a search warrant issued on July 27, 1972, namely: a clip for a .45 caliber automatic pistol, rounds of .45 caliber and other ammunition, and knives. We reverse.

I.

In the affidavit for search warrant the affiant, Special Agent Roy M. Mitchell of the FBI, stated that an informant who had provided reliable information over a period of years informed him on May 18, 1972 that in the evening of the preceding day Stanley Robinson, a Chicago Police Department Sergeant, had arrested one Jeff Beard on the street in Chicago for an alleged armed robbery, had handcuffed Beard, and then had driven him to a location in Gary, Indiana and there shot him with a .45 caliber automatic pistol and cut his throat with a knife, killing him. The affidavit also stated that Mitchell went with the informant to that place and found a body, which proved to be that of Jeff Beard. The throat was cut and a .45 caliber bullet was found in the body.

The affidavit further recited that several days later Mitchell came into possession of the .45 caliber automatic pistol "reportedly used by Stanley Robinson in the kidnap-murder of Jeff Beard," but it did not say how he got it or the source of the information that it was the murder weapon.

The affidavit further recited that "on June 21, 1972, Kelly Fox, apartment # 14, 808 Lakeside Street, Chicago, informed affiant that . . . Robinson . . . resides with her and their daughter on the average of two or three nights per week, and has done so over the past 7 years," and that Robinson kept "his personal belongings in the closet." It is recited that on July 18 and 19 affiant again talked with Kelly Fox at her apartment and that she stated that "items left by Robinson shortly before his disappearance on June 26, 1972 are contained in two suitcases and two cardboard boxes in the closet just off the living room in her apartment. She stated that affiant could look at these items since they were left in her care, but would not allow seizure of any items without a search warrant." The affidavit then recited that affiant "observed a clip for a .45 caliber pistol and miscellaneous rounds of ammunition, including .45 caliber ammunition and other calibers, as well as miscellaneous knives, including a switchblade knife." The affiant, the affidavit went on to recite, had no way of knowing whether the clip observed was the clip from the pistol reported to be the murder weapon, and an examination by the FBI laboratory in Washington was necessary.

A search warrant was issued on July 27, 1972, authorizing the seizure of the clip, the ammunition, the knives, "and other evidence." The warrant was executed by the seizure of the articles named therein and also miscellaneous papers and some photographs.

## II.

After an evidentiary suppression hearing, the district judge found that the reliability of the informer's information "was corroborated by the fact of the slaying, the identity of the victim, the location of the body, the infliction of the bullet wound, the infliction of the knife wound, and that Robinson had in his possession and stored in a closet in an apartment he shared with his paramour a clip for a .45 automatic, .45 caliber ammunition and knives capable of inflicting the knife wound." He concluded that "[a]ll this constituted sufficient probable cause for the issuance of the warrant authorizing seizure of the clip, the .45 caliber ammunition and the knives."

However, the district judge further concluded that the warrantless searches of the boxes on June 21 and July 18 were unlawful and that therefore the search warrant based in material part on information gained in those searches must be held invalid. We disagree with the latter conclusion.

## III.

Evidence adduced at the suppression hearing supported in substantial detail the facts recited in the search warrant. The hearing further disclosed that Kelly Fox also had belongings in the apartment closet off the living room; that men's and women's clothing hung from a rack in the closet, about two-thirds of it being women's clothing; that nothing was seized from the two suitcases; that the two cardboard boxes were about 1½' x 1½' x 1', one being a little larger than the other; that "one didn't have a top and the other one's top wouldn't close because it was too full;" that most of the contents of the boxes consisted of papers, including letters, bills, police reports, police bulletins, class notes and pieces of paper with license numbers written on them; and that also in the boxes but apparently not visible until papers were removed, were the .45 caliber clip, the ammunition and the knives.

The hearing also revealed that Agent Mitchell had been accompanied by FBI Agent Roten and a Chicago police officer on June 21 and by Agent Roten on July 18, 1972 when the Fox apartment

was searched; that on both occasions Kelly Fox served coffee to the men; and, as expressly found by the district judge, that "as the agents testified, she purported to authorize the search and made no protest as it was going on."[1]

Between the June 21 and the July 18 searches, Robinson had disappeared and a warrant had been issued for his arrest. He had taken a metal box and some other items with him when he disappeared.

## IV.

■ It is clear that "where two persons have equal rights to the use or occupation of premises, either may give consent to a search, and the evidence thus disclosed can be used against either." United States v. Sferas, 210 F.2d 69, 74 (7th Cir.), cert. denied, Skally v. United States, 347 U.S. 935, 74 S.Ct. 630, 98 L.Ed. 1086 (1954); United States v. Stone, 471 F.2d 170, 173 (7th Cir. 1972), cert. denied, 411 U.S. 931, 93 S.Ct. 1898, 36 L.Ed.2d 391 (1973). A defendant's paramour may give valid consent to the search of premises they jointly occupy. United States v. Airdo, 380 F.2d 103, 106–107 (7th Cir.), cert. denied, 389 U.S. 913, 88 S.Ct. 238, 19 L. Ed.2d 260 (1967). The rule is not based on principles of agency but rather on the "reasonableness, under all the circumstances, of a search consented to by a person having immediate control and authority over the premises or property searched. Cf. Roberts v. United States, [332 F.2d 892,] 896–897 (8th Cir. 1964)]." *Id.* The rule is not based upon the joint possessor's right to waive the other's constitutional rights but on her "own rights to authorize entry into the premises where she lives and of which she had control." Roberts v. United States, *supra,* 332 F.2d at 897.

The district court found that in this case "as in *Airdo,* the paramour 'lived in the apartment and therefore had authority to consent to a search of it,' including the foyer closet where the boxes were kept. She jointly used the unlocked closet." The consent given by Fox was voluntary. The question is whether a search of the two cardboard boxes was permissible.

At the outset it is obvious that this question is not solved by those cases where a defendant-tenant claims exclusive occupancy to a specified portion of larger premises occupied by a consenting landlord. United States v. Mattlock, 476 F.2d 1083 (7th Cir. 1973). Here no landlord-tenant relationship existed between Kelly Fox and the defendant, nor does the defendant claim exclusive dominion and control over a specific room or portion of a room or particular area of the apartment. *Cf.* United States v. Wixom, 441 F.2d 623, 625 (7th Cir. 1971), where Judge Kiley said: "Each had equal rights to the use and occupation of the premises at the time of the search, and either could give consent to the search, the fruit of which would be admissible against the other party."

The question must be approached in the light of several policy considerations: First, the Fourth Amendment protects against search areas "where, like a home . . . a person has a constitutionally protected reasonable expectation of privacy." Katz v. United States, 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). If a spouse does not have complete expectation of privacy in his own home in view of the possibility of his mate's consent, the casual lover who drops in at his convenience can hardly expect more when he turns his part-time home over to the full-time dominion of his paramour and then places his belongings in unlocked, uncovered cardboard boxes in a closet frequented by her. Here the defendant also impliedly disavowed any expectation of privacy in the

---

1. The district judge further found: "I do not credit . . . [Kelly Fox's] testimony to the effect that she asked them on . . . [both occasions] not to go through the boxes because they contained Robinson's things, or that she did not give her consent to the search of the closet and the boxes."

cardboard boxes when he disappeared with a metal box and other belongings but ignored the cardboard boxes.

A second policy consideration surfaces when the defendant is absent from his dwelling by reason of flight or hiding from law enforcement officers for fear of arrest, at which time a strong case for third party consent is presented. United States v. Stone, 471 F.2d 170, 177 (7th Cir. 1972) (Swygert, J., dissenting), cert. denied, 411 U.S. 931, 93 S.Ct. 1898, 36 L.Ed.2d 391 (1973); Wade v. Warden, Maryland Penitentiary, 278 F.Supp. 904 (D.Md.1968). In the present case, the defendant had fled prior to the July 18 search.

Finally, there are the policy considerations posed by Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969), where Mr. Justice Marshall delivered the opinion for a unanimous Court. A duffel bag was being jointly used by defendant and his cousin Rawls and it had been left in Rawls' home. Both Rawls and his mother consented to the search. Defendant argued that Rawls only had actual permission to use one compartment of the bag and that he had no authority to consent to a search of the other compartments, in one of which the officers found some of defendant's belongings. The Court said at 394 U.S. 740, 89 S.Ct. 1425:

> "We will not, however, engage in such metaphysical subleties in judging the efficacy of Rawls' consent. Petitioner [defendant], in allowing Rawls to use the bag and in leaving it in his house, must be taken to have assumed the risk that Rawls would allow someone else to look inside. We find no valid search and seizure claim in this case."

The police might be deterred from employing consent searches altogether if they were required to ascertain the ownership or possession or custody of every article or space on the premises searched. The metaphysical subleties would be endless and consent searches would be lost from the law enforcement arsenal.

This case is quite similar to White v. United States, 444 F.2d 724 (10th Cir. 1971), where a paramour gave permission to officers to search a motel unit occupied jointly by her and the defendant, leading to the search of a small, cloth zipper bag owned by the defendant. The court concluded that the paramour's consent to the motel search extended to the defendant's bag.

The case relied upon by the defendant and the district court in this case, United States v. Poole, 307 F.Supp. 1185 (E. D. La.1969), is distinguishable. Poole was an overnight guest in Dickson's apartment and had left his overnight bag in the hall closet. When the officers obtained Dickson's consent to the search at 1:15 A.M. in the morning, Poole was present in the bedroom and his consent was neither given nor sought. Since evidence obtained in a search is inadmissible against a person having equal rights in the premises if he is present at the time of the search and does not consent, Lucero v. Donovan, 354 F.2d 16 (9th Cir. 1968), the *Poole* case does not detract from the interspousal consent doctrine of *Sferas, Airdo* and *Stone.*

■ The portion of the order of May 15, 1973, granting defendant's motion to suppress the clip for a .45 caliber automatic pistol, rounds of .45 caliber and other ammunition and knives is reversed.

SWYGERT, Chief Judge (dissenting).

I respectfully dissent. With all due deference to my colleagues, I believe that impermissible inferences are drawn from the record, certain findings made by the trial judge are overruled without holding them to be clearly erroneous, my dissent in United States v. Stone, 471 F.2d 170 (7th Cir. 1972), is misread, and Frazier v. Cupp, 394 U.S. 731, 89 S. Ct. 1420, 22 L.Ed.2d 684 (1969), is extended to the point of creating a griev-

ous inroad on protections heretofore guaranteed by the fourth amendment.

The majority characterizes Robinson as a "casual lover" who, having turned "his part-time home over to the full-time dominion of his paramour," dropped in thereafter "at his convenience."[1] The findings of the trial judge do not support this view. The judge did not find that Robinson had given up possession of his home; he found merely that Robinson had disappeared from police view. Nor can Robinson be called a "casual" lover. The names "Fox-Robinson" were displayed on the doorbell-mailbox of the apartment in question, and the district judge credited the testimony of Fox that she had known Robinson for seven years and had had a daughter by him who lived with her in the apartment. There is another bothersome aspect of the view taken by the majority. If Robinson had turned over his "part-time" home to the "full-time dominion of his paramour," why need the majority rely so heavily on cases which authorize consent by a *joint* possessor? A similar inquiry must be made with reference to the majority's theory that Robinson had relinquished possession of the boxes by abandonment upon his disappearance.[2] Neither question, I submit, has an answer.

A more basic error of the majority is their failure to recognize that Robinson's disappearance occurred after the Government agents had once gone through his boxed possessions and had discovered the items eventually listed in their request for a warrant. The FBI first came into contact with Fox on June 21, 1972, when they obtained and acted upon her consent to search the boxes on the closet floor. Robinson disappeared five days later. On July 18, the FBI reappeared at the request of Fox and again searched the boxes with her consent after inquiring whether the items were still on the premises. The trial judge held, on the authority of Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1942), that if the warrantless search of June 21 was illegal, all subsequent activity by the agents, even if otherwise legal, was thereby tainted, requiring the suppression of the items seized by warrant on July 27. This holding could have been based only on the presupposition that the search of July 18 would probably not have occurred but for the search of June 21. This factual inference cannot be overruled unless clearly erroneous. The majority does not so characterize the finding, nor can I, particularly in light of the fact that the agents asked Fox, on July 21, "whether the boxes were *still*" in her apartment. (emphasis added).

This same error inheres in the majority's theory that Robinson abandoned the boxes, as well as in their "flight" rationale borrowed from my dissent in *Stone*. Both the flight and the supposed abandonment occurred after the agents had made their initial search on June 21. I take issue with the abandonment theory on the additional ground that it has, at best, sketchy support in the record. When a person is in flight from law enforcement officers, he does not relinquish his rights under the fourth amendment. To hold that that property which he has left behind ceases to enjoy the protection of that amendment simply because he has chosen to take a few other possessions with him is to deprive

---

1. It is patent that Robinson did much more than drop in "at his convenience" before he disappeared on June 26. The district judge found:

   They [FBI Agents] asked her [Fox] how often he was at the apartment. She said he stayed there two nights a week, according to her testimony, or three or four, according to the agents. She said he worked 5 nights a week and was there during the daytime hours almost every day on which he was on night duty.

2. The majority states:

   Here the defendant also impliedly disavowed any expectation of privacy in the cardboard boxes when he disappeared with a metal box and other belongings but ignored the cardboard boxes.

him of a legitimate right to privacy. I might add in passing that the Government has made no attempt to argue abandonment.

As to the majority's reliance on the fact that Robinson was in hiding from law enforcement officials, neither my dissent in *Stone* nor Wade v. Warden, Maryland Penitentiary, 278 F.Supp. 904 (D.Md.1968), support them. *Stone* dealt with a consent to search obtained from a suspect's wife only minutes after he had been taken into custody. I took the view that search by consent of third parties is reasonable under the fourth amendment only where well defined exigent circumstances exist, one of which might be the absence of a suspect by reason of flight or hiding. This was not the case in *Stone* since Stone could have been asked for his consent at the time of search. Neither the majority nor I reached the issue of the proper scope of search given a valid consent; our sole focus was upon whether any search by consent would lie. *Wade* is similarly distinguishable.

Having dissented in *Stone*, I accept the rule of this circuit that "where two persons have equal rights to the use or occupation of premises, either may give consent to a search," United States v. Sferas, 210 F.2d 69, 74 (7th Cir.), cert. denied, 347 U.S. 935, 74 S.Ct. 630, 98 L. Ed. 1086 (1954). As the very statement of the rule suggests, however, a question in every case such as this must be whether the third party who consents is in fact or in appearance a joint possessor. In United States v. Mattlock, 476 F.2d 1083 (7th Cir. 1973), cert. granted,

412 U.S. 917, 93 S.Ct. 3006, 37 L.Ed.2d 1000, this circuit held that a defendant's "constitutional rights could be waived only if it was proved [by the Government] that reasonable appearance of authority to consent existed and, also, that just prior to the search, facts existed showing actual authority to consent." On this authority, the Government's failure of proof is beyond dispute. And even if apparent authority were the sole criterion, the Government could not maintain its position. How can it be argued that Fox was the apparent joint possessor of Robinson's boxes when she told the FBI on June 21 that the boxes belonged to Robinson? The argument becomes more unreasonable when note is taken of the trial judge's finding that Fox, in referring to the boxes, told the agents on July 18 that "Robinson didn't like for her to go through *his* things." (emphasis added).

Nevertheless, the majority upholds her consent, declining to engage in "endless . . . metaphysical subtleties." The authority for their reticence is comprised of two cases, Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969), and White v. United States, 444 F.2d 724 (10th Cir. 1971), both of which are distinguishable. The Court in *Frazier* concluded that the defendant, "in allowing Rawls [consenting party] to use the bag and in leaving it in his house," took the risk that Rawls would allow a search. 394 U.S. at 740, 89 S.Ct. at 1425. In this case the preponderance of evidence showed no joint use and the trial judge so found.[3] Robinson cannot be said to have assumed the risk that

3. The findings of the trial judge included these:

> The contents of the boxes were, in the Fourth Amendment's phrase, "papers and effects," and principally papers. Apart from the snapshots, which are discussed below, the contents of the boxes were exclusively Robinson's papers and effects and not Kelly Fox's. It is true that the boxes were not sealed, and one had no top and the other was not completely closed because it was too full; but that circumstance, while

> it gives the government its strongest argument, relates only to whether Robinson had reasonable expectations of privacy in, exclusive control over, and the right to exclude others from, the boxes. The condition of the boxes perhaps shows carelessness on Robinson's part but under all the circumstances hardly deprives them and their contents of their status as his personal papers and effects or negatives a reasonable expectation that others would not go through them without his permission.

Fox would permit others to search his personal belongings, having told her that he "didn't like for her to go through his things." The agents were apprised of Robinson's statement before they made the second search, unlike the situation in *Frazier*, where Rawls made no mention of the fact that the bag belonged to someone else. Rawls thus had at least apparent authority to consent. The same may be said of *White*, where the paramour made no assertions that property searched and seized was not hers.

The distinction is important. The Government argues in its brief: "The constitutional rights of a defendant should not depend on the accident of whether or not his spouse describes their property arrangements to searching officers." I am in agreement, though not as the Government would have it. The requirement that apparent authority exist for a consent to search reflects the need to hold police officers to what they hear and observe. If a man tells police he is a janitor and admits them to the room of a tenant, they cannot thereafter claim that they thought him to be the lessee. But when the consenting party says nothing, as in *White*, a search is often upheld. No longer, however, may the Government rely on silence; *Mattlock* effectively

places upon the police the burden of determining whether a person encountered at the door has the authority to consent.

Another contention of the Government, set forth in its brief, is that the conclusions of the trial court are contrary to the purpose of the exclusionary rule and opposed to the interests of law enforcement:

> The drastic sanction of the exclusionary rule was designed to deter official misconduct in the perpetration of unreasonable searches and seizures. . . . How are officers to be deterred by facts which they do not know? The "expectations of privacy" between joint occupants of an apartment would not be readily apparent. It is true that the trial court emphasizes the fact that Miss Fox told the officers the boxes belonged to Robinson. But this cannot be the basis of a rule, or else third party consent searches would disappear altogether. In every such situation, it is made clear that it is precisely the property of the absent defendant which the officers want to search.

This argument assumes too much. The police may search for and seize property of a suspect so long as they limit their entry to areas in which the consenting party has rights of joint tenancy and so

---

The only evidence that the boxes contained anything belonging to Kelly Fox is Agent Roten's and Officer Tobin's testimony that certain snapshots, at least one of which she said was hers, were found in one of the boxes. It turned out that the snapshot she referred to, showing, *inter alia*, an American Indian in native dress, was a copy of one which, with other snapshots, was in a dresser drawer she shared with Robinson in a bedroom in the apartment. She testified that the snapshots the agents said came from the boxes in fact came from the dresser drawer. The evidence that the snapshots were found in one of the boxes rather than in the dresser drawer is not convincing to me. The best that can be said for Officer Tobin's testimony is that he did not appear to remember the pertinent facts.

I am not convinced that Agent Roten remembered where the snapshots were found, although he thought he did. It must be recalled that he was not aware, even at the time he testified, that Officer Tobin had searched the dresser drawers in the bedroom, where many snapshots admittedly were kept. Since last summer, recollection and surmise may well have merged concerning a point apparently thought to be of little significance. But assuming the snapshots were in one of the boxes, this is scant evidence, absent any indication of how they came to be there. It appears unlikely, considering all the other facts and circumstances, that Kelly Fox ever used the boxes or looked into them. The government has the burden of proving facts which would justify the warrantless search.

long as the items seized have at a minimum some ostensible relevance to their investigation. Here a murder investigation was underway. Had the police seen the weapons and ammunition lying on a kitchen table, I entertain no doubt that those items could properly have been seized. But the items were not in plain view; they were concealed in a box of Robinson's personal belongings. To allow Robinson his privacy in that box would not, as the majority assumes, require the police "to ascertain the ownership or possession or custody of every article or space on the premises searched." They need only be certain that their examination is confined to spaces jointly shared by the tenants or within the sole dominion of the consenting party. To require less is to say that no person sharing a home with another enjoys a right to privacy free of his cotenant's discretion.

The Government cites numerous cases where courts have approved a third party consent search of containers exclusively used by defendants but found on shared premises. Yet few of these cases deal with the scope of search, and in none was there an express disavowal of joint possession.[4] Cases which have dealt directly with the scope of a third party consent search are largely contrary to the Government's position.

A typical case is State v. Evans, 45 Haw. 622, 372 P.2d 365 (1972), where the Hawaii Supreme Court accepted the joint control rule but found the search unreasonable because the consenting wife had allowed the search to include not only common areas of the house, but her husband's personal effects, namely, some jewelry hidden in a cuff link case located in a bedroom bureau drawer. The court held:

> Clearly, one in joint control of the premises, at least when no objection is made by the other occupant, may admit police officers to the house, and the question of coercion aside it also is clear that no illegal search is involved as to what is in plain sight when the police officers are so admitted. See People v. Howard, 166 Cal. App.2d 638, 334 P.2d 105. We are not prepared to say how much further the officers may proceed or whether we agree with the above-cited cases on their facts. None of them goes so far as to hold that a wife in joint occupancy of the home can permit a search of her husband's personal effects to discover jewelry hidden in a cuff link case in a bedroom bureau drawer. The wife has no such right. 372 P.2d at 371-372.

For other cases accepting this view, see Gurleski v. United States, 405 F.2d 253 (5th Cir. 1968), cert. denied, 395 U.S. 981, 89 S.Ct. 2140, 23 L.Ed.2d 769 (1969); Roberts v. United States, 332 F.2d 892, 897 (1964) (both of which note that the search did not extend to the "personal effects" of the appellant); United States v. Poole, 307 F.Supp. 1185 (1967);[5] People v. Carter, 48 Cal.2d 737, 312 P.2d 665 (1957); State v. McCarthy, 20 Ohio App.2d 275, 253 N.E. 789 (1969); People v. Gonzalez, 50 Misc. 2d 508, 270 N.Y.S.2d 727 (1966); *see*

---

4. *Stone* is just such a case. It is also distinguishable in that the green tackle box was itself an important piece of evidence, having been previously observed by numerous witnesses, and was lying in plain view of an area where the officers had a right to be under United States, v. Airdo, 380 F.2d 103 (7th Cir.), cert. denied, 389 U.S. 913, 88 S.Ct. 238, 19 L.Ed. 2d 260 (1967). The boxes here had no evidentiary value; the important matter was concealed therein.

5. The majority distinguishes *Poole* in this fashion:

> Since evidence obtained in a search is inadmissible against a person having equal rights in the premises if he is present at the time of the search and does not consent, Lucero v. Donovan, 354 F.2d 16 (9th Cir. 1968), the *Poole* case does not detract from the interspousal consent doctrine of *Sferas*, *Airdo* and *Stone*.

I cannot reconcile this distinction with our recent holding in *Stone*.

Reeves v. Warden, 346 F.2d 915 (4th Cir. 1965); Holzhey v. United States, 223 F.2d 823 (5th Cir. 1955); Cass v. State, 124 Tex.Cr.R. 208, 61 S.W.2d 500, 504 (1933).

I would affirm the suppression order of the district court.