UNITED STATES of America, Plaintiff–Appellee,

v.

Cesar DURAN, Defendant–Appellant.

No. 91–1926.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 18, 1991.

Decided March 17, 1992.

---

Grant C. Johnson, Asst. U.S. Atty., Office of U.S. Atty., Madison, Wis. (argued), for plaintiff-appellee.

Charles W. Giesen, Morris D. Berman (argued), Giesen & Berman, Madison, Wis., for defendant-appellant.

Before POSNER, FLAUM and KANNE, Circuit Judges.

FLAUM, Circuit Judge.

Karen Duran, wife of appellant Cesar Duran, could not figure out how to lace a pair of recently purchased leather "L.A. Gear" high-top tennis shoes, so she sought assistance at a Foot Locker store in the Janesville (Wisconsin) Mall. Karen left the shoes with a Foot Locker employee who agreed to lace them; in the interim, she shopped elsewhere in the Mall and had lunch with her two daughters, who were then two and three years old. After Karen departed, the employee discovered in the shoes three packages of what appeared to be marijuana, and called the police. Detectives Laura Massey and Douglas Witt of the Rock County Metro Unit joined a Janesville police officer at the scene, examined the packages, and determined that they indeed contained marijuana. Upon Karen's return to the Foot Locker, the officers took her to the back room and placed her under arrest. Detective Massey proceeded to search Karen's purse (with her consent), and found over $3,000 in cash, a small container of cocaine, and some drug paraphernalia. The Janesville officer read Karen her Miranda rights and, along with the detectives, transported her and the children to the Janesville Police Department.

At the station Detective Witt escorted Karen and the children to an interview room and again advised Karen of her Miranda rights. Karen indicated her willingness to talk, and advised Witt that she, her husband Cesar, and the children lived in a house on Highway H near Hanover, Wisconsin. After further questioning, Karen admitted that Cesar sold large quantities of marijuana in the Janesville area. At Witt's prompting, she then signed a form consenting to a search of the Duran residence, as well as several outbuildings and an old farmhouse on the property. The police discovered a number of weapons during the search, as well as approximately 28 pounds of marijuana in the old farmhouse, and promptly took Cesar into custody.

A federal grand jury indicted Cesar for one count of possessing marijuana with the intent to distribute in violation of 21 U.S.C. § 841(a) and one count of using a firearm in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1). Cesar filed a number of pretrial motions, one of which sought to suppress the seized marijuana on the ground that Karen's consent to the search of the old farmhouse was defective. After an evidentiary hearing, a magistrate judge recommended that Cesar's suppression motion be denied, and the district court adopted the recommendation. *United States v. Duran*, No. 90–CR–93–S (W.D.Wis. Feb. 19, 1991). Cesar pled guilty to the marijuana possession count, and the government dismissed the firearms count. The district court accepted Cesar's plea and sentenced him to 30 months of imprisonment, followed by 5 years of supervised release.

Cesar appeals the district court's ruling on the suppression motion (having reserved the right to do so in the plea agreement). He further appeals the district court's refusal to reopen the suppression hearing to permit him to probe Detective Witt regarding misconduct in a different case. We affirm.

## I.

The fourth amendment permits police to conduct a warrantless search without probable cause if an authorized individual voluntarily consents to the search. *Florida v. Jimeno*, ── U.S. ──, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991); *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Karen consented to the search of the Duran property, but Cesar challenges the search on two distinct grounds; he contends that Karen's consent was involuntary, and that Karen had neither actual nor apparent authority to con-

sent to a search of the old farmhouse. We consider each contention in turn.

## A.

■ Consent searches are valid only if the consent was freely and voluntarily given. *Schneckloth*, 412 U.S. at 222, 93 S.Ct. at 2045. The question of whether a consent was voluntary, as opposed to the product of duress or coercion, "is a question of fact to be determined from the totality of all the circumstances." *Id.* at 227, 93 S.Ct. at 2048. The government bears the burden of proving voluntariness by a preponderance of the evidence, *id.* at 222, 93 S.Ct. at 2045; *United States v. Lechuga*, 925 F.2d 1035, 1041 (7th Cir.1991), and we will not reverse a district court's finding on this issue unless clearly erroneous. *United States v. Talkington*, 843 F.2d 1041, 1047 (7th Cir.1988); *accord United States v. Battista*, 876 F.2d 201, 207 (D.C.Cir.1989); *United States v. Arango–Correa*, 851 F.2d 54, 57 (2d Cir.1988).

■ The district court determined that, all things considered, Karen voluntarily consented to the search. Cesar lists a number of factors in an attempt to prove the court wrong, but most of them do not help his cause. First, Cesar notes that this was the first time Karen had ever been placed under arrest. This may very well be true, but while one's lack of prior experience with the criminal justice system may be relevant to voluntariness in some circumstances, it was not here. The form Karen signed informed her that she had a right to withhold consent, and further that any evidence discovered as a result of the search could be used against her in a court of law. These warnings put her on par with the experienced arrestee in terms of what she really needed to know under the circumstances. That the form contained these warnings, in fact, weighs heavily toward finding that her consent was voluntary. *United States v. Mendenhall*, 446 U.S. 544, 558–59, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980); *United States v. Valencia*, 913 F.2d 378, 381 (7th Cir.1990); *United States v. Morgan*, 725 F.2d 56, 58 (7th Cir.1984).

Cesar also points out that Karen, who was 22 or 23 years old at the time, had only a high school education and was not familiar with legal matters. While the definition of voluntariness takes into account "evidence of minimal schooling [and] low intelligence," *Schneckloth*, 412 U.S. at 248, 93 S.Ct. at 2058, Karen's characteristics along those lines suggest just the opposite of what Cesar would have us conclude. *See Mendenhall*, 446 U.S. at 558, 100 S.Ct. at 1879 (22–year old defendant with an 11th-grade education "plainly capable of a knowing consent"); *Welch v. United States*, 466 A.2d 829, 843–44 (D.C.App. 1983). Cesar next complains that the police told Karen that they would obtain a warrant in the event she did not consent to a search. This may have induced Karen to grant her consent, but it was not coercive under the fourth amendment. Although empty threats to obtain a warrant may at times render a subsequent consent involuntary, *see Talkington*, 843 F.2d at 1049 (consent invalid when police lied in telling suspect that they were in the process of getting a search warrant); *Dotson v. Somers*, 175 Conn. 614, 402 A.2d 790, 794 (1978) (consent invalid where police had insufficient grounds upon which to base a warrant application), the threat in this case was firmly grounded. Karen's admission that Cesar dealt marijuana would have provided the police probable cause had they sought a search warrant, so their threat to do so in the event she refused consent was entirely proper. *See United States v. Colonia*, 870 F.2d 1319, 1324–25 (7th Cir. 1989); *accord United States v. Calvente*, 722 F.2d 1019, 1023 (2d Cir.1983), *cert. denied*, 471 U.S. 1021, 105 S.Ct. 2030, 85 L.Ed.2d 313 (1985).

■ As further evidence that Karen's consent was coerced, Cesar points out that the police did not supply Karen with a diaper to replace the one their younger daughter had soiled sometime after the arrest. The magistrate judge found that the police offered Karen an opportunity to use a bathroom at the station to wash her daughter, but that she declined because she had no diapers. While the child's con-

dition probably made Karen's stay at the police department distinctly more unpleasant, the officers did all they had to under the circumstances; their refusal to leave the station and procure a diaper, or to permit Karen to do the same, was not coercive.

The other factors Cesar raises strike us as more substantial. That Karen consented while being held in custody in the Janesville police station bears on the issue of voluntariness. *Cf. Mendenhall,* 446 U.S. at 559, 100 S.Ct. at 1879 (in upholding validity of defendant's consent, emphasizes that her presence in police office was voluntary). The potentially coercive effect of her custody, however, was mitigated by the circumstances; Karen was arrested during the day and without a show of force, was not kept under close restraint at the station, and was not subject to an aggressive display of weaponry, and was not harshly interrogated—in fact, Karen characterized Witt's conversation with her as "gentlemanly". *See* 3 Wayne R. LaFave, *Search and Seizure* § 8.2(b), at 183 (2d ed. 1987) (citing cases); *cf. Talkington,* 843 F.2d at 1048–49.

■ Finally, Cesar points to Karen's fragile emotional state at the time she consented, which was exacerbated by her failure, for about a week prior to her arrest, to take medicine (Prozac) prescribed for a nervous disorder. This factor also bears on voluntariness, and the district court erred in discounting its importance; contrary to the court's suggestion, it is immaterial whether her fragile emotional state arose from official coercion or not. *Talkington,* 843 F.2d at 1047–48 (citing *Schneckloth,* 412 U.S. at 229, 93 S.Ct. at 2048). Nonetheless, the fact that a consenting party is extremely upset at the time she consents is not dispositive. *Colonia,* 870 F.2d at 1324–25; LaFave, *supra,* § 8.2(e), at 199 (one should not assume "that anyone suffering from some type of mental disease or defect is inevitably incapable of giving a voluntary consent to a search"). True, Karen broke into tears several times during her interrogation, but absent a showing that her emotional distress was so profound as to impair her capacity for self-determination or understanding of what the police were seeking, it is not enough to tip the balance towards finding that her consent was involuntary.

In light of all the circumstances—particularly the fact that the police informed Karen of her right to refuse consent—we cannot say that the district court's ruling on this matter was erroneous, let alone clearly so.

### B.

■ Cesar next contends Karen had neither actual nor apparent authority to consent to a search of the old farmhouse. It is well established that "the consent of one who possesses common authority over [the] premises ... is valid as against the absent, nonconsenting person with whom that authority is shared." *United States v. Matlock,* 415 U.S. 164, 170, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). The government bears the burden of establishing that Karen possessed the requisite common authority. *Illinois v. Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, 2797, 111 L.Ed.2d 148 (1990). Such authority does not "rest upon the law of property," *Matlock,* 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7; as such, Cesar's observation that Karen had no ownership interest in the Duran property, even if true, is irrelevant in assessing the validity of the search. *See United States v. Clutter,* 914 F.2d 775, 778 (6th Cir.1990) (teenage son may validly consent to search of his parents' bedroom), *cert. denied,* —— U.S. ——, 111 S.Ct. 1413, 113 L.Ed.2d 466 (1991). Rather, common authority rests "on mutual use of the property by persons generally having joint access or control for most purposes." *Matlock,* 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7.

■ As a general matter, one spouse has the authority to consent to a search of a premises jointly occupied by both spouses. *Id.* at 170, 94 S.Ct. at 993; *United States v. Stone,* 471 F.2d 170, 173 (7th Cir.1972), *cert. denied,* 411 U.S. 931, 93 S.Ct. 1898, 36 L.Ed.2d 391 (1973); *United States v. Sferas,* 210 F.2d 69, 74 (7th Cir.), *cert. denied,* 347 U.S. 935, 74 S.Ct. 630, 98 L.Ed. 1086

(1954); *United States v. Harrison,* 679 F.2d 942, 947 (D.C.Cir.1982); LaFave, *supra,* § 8.4(a), at 275–76 (citing cases). But the circumstances of this search pose a subtle twist on the general rule—the key here is the limiting term "jointly occupied." Note that Cesar does not challenge (on authority grounds) the search of the Duran residence, which is jointly occupied by Karen and Cesar, and over which Karen clearly has common authority. Rather, he challenges the search of the old farmhouse—to which, he claims, Karen had no joint access or control and hence no authority. In support, Cesar observes that Karen believed that the farmhouse was Cesar's private gym, that she never went into or used the structure, and that the police did not find any of her clothing or personal effects there.

One might ask whether this matters. If we establish a per se rule that common spousal authority extends to every square inch of property upon which a couple's residence is built—in other words, if we presume in every case without further inquiry that every square inch is jointly occupied—the facts Cesar raises are irrelevant. The advantages to establishing such a rule are clear; it would obviate the need to split hairs in discerning the particular areas of a homestead over which each spouse has authority, provide law enforcement officials more certainty and courts an easy rule to apply, and reduce the chance of inconsistent outcomes. *Compare State v. Evans,* 45 Haw. 622, 372 P.2d 365, 370–73 (1962) (wife may not consent to search of husband's cuff link case found in top drawer of dresser) *with People v. Stacey,* 58 Ill.2d 83, 317 N.E.2d 24, 27–28 (1974) (wife may consent to search of dresser drawer in which only husband kept clothing); *see generally United States v. Robinson,* 479 F.2d 300, 303 (7th Cir.1973); Antonin Scalia, *The Rule of Law as a Law of Rules,* 56 *U.Chi.L.Rev.* 1175 (1989); Frederick Schauer, *Rules and the Rule of Law,* 14 *Harv. J.L. & Pub. Pol'y* 645, 657–63 (1991).

But erecting a per se rule in this context might detach the third-party consent rule from its moorings. Common authority rests upon mutual use and joint access and control. Privacy interests, and the relinquishment thereof, also play prominently, not only from a logical standpoint (one who grants joint access to another, by definition, surrenders a degree of privacy), but also because we are dealing with the fourth amendment and governmental intrusions into the home. *See Oliver v. United States,* 466 U.S. 170, 178, 104 S.Ct. 1735, 1741, 80 L.Ed.2d 214 (1984); *Katz v. United States,* 389 U.S. 347, 350, 88 S.Ct. 507, 510, 19 L.Ed.2d 576 (1967); *United States v. Chaidez,* 919 F.2d 1193, 1202 (7th Cir. 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2861, 115 L.Ed.2d 1028 (1991), —— U.S. ——, 112 S.Ct. 209, 116 L.Ed.2d 167 (1991). The theory of third-party consent, it appears, is that when A shares control over a given premises with B, or grants B fairly liberal access, A surrenders some of his privacy interests in that he necessarily assumes the risk that B will permit inspection of the premises "in his own right." *Matlock,* 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7; *see also Chaidez,* 919 F.2d at 1202. In this light, the per se rule is defective because it presumes that spouses, in forging a marital bond, remove any and all boundaries between them—in other words, that spouses surrender all privacy or other individual interests with respect to one another. Some might argue that this represents the ideal in marriage, and perhaps they are right. But although marriage may be the most intimate of all human relations, this ideal does not reflect reality, either in practice or in the eyes of the law (e.g., prenuptial agreements, community property exemptions for property obtained prior to marriage). Not all spouses share everything with their mates, which is another way of saying that spouses do not surrender every quantum of privacy or individuality with respect to one another.

 Accordingly, we leave open the possibility that one spouse may maintain exclusive control over certain portions of the family homestead. The task that remains is determining whether such exclusive control exists. In doing so, it would be incorrect to treat spouses (or paramours, *see United States v. Robinson, supra* ) the

same as any two individuals sharing living quarters. Two friends inhabiting a two-bedroom apartment might reasonably expect to maintain exclusive access to their respective bedrooms, without explicitly making this expectation clear to one another. *See* LaFave, *supra*, § 8.5(c), at 300. The same might hold for an adult child living at home. *See United States v. Whitfield*, 939 F.2d 1071, 1074–75 (D.C.Cir. 1991). These situations, as a general rule, involve privacy expectations greater than those inherent in a marriage, making it more difficult to demonstrate common authority. In the context of a more intimate marital relationship, the burden upon the government should be lighter. We hold that a spouse presumptively has authority to consent to a search of all areas of the homestead; the nonconsenting spouse may rebut this presumption only by showing that the consenting spouse was denied access to the particular area searched.

 Accordingly, the mere fact that Karen neither used the old farmhouse nor left any of her personal effects there does not bear on whether Cesar maintained exclusive dominion over the structure. One can have access to a building or a room but choose not to enter. In contrast, Karen's belief that the farmhouse was Cesar's private gym is relevant; it is circumstantial evidence, albeit weak, that Karen may have been denied access thereto. Karen's testimony at the suppression hearing, however, leads us to the opposite conclusion:

> AUSA: And Mr. Giesen [Cesar's attorney] said that you didn't have access to [the old farmhouse].
>
> Karen: That's correct.
>
> AUSA: Well, you could have gone in it; right?
>
> Karen: But I never wanted to.
>
> AUSA: Okay. Whether you wanted to or not is not my question, ma'am. You could have gone into it; right?
>
> Karen: If I ever wanted to, right.
>
> AUSA: If you wanted to?
>
> Karen: If I wanted to.

IV Tr. at 42–43 (testimony of Karen Duran). This testimony demonstrates that Karen was not denied access to the old farmhouse, but rather made it a habit not to enter the building. It also buttresses the district court's decision to discredit testimony that the farmhouse was locked and that Karen had no key—testimony which, if true, could have bolstered Cesar's claim that Karen was denied access to the structure.

In sum, we find that Karen, as Cesar's spouse, had actual authority to consent to a search of the farmhouse. It is therefore unnecessary to determine whether she had apparent authority under *Illinois v. Rodriguez, supra*.

## II.

 Finally, Cesar contends that the district court should have reopened the suppression hearing to permit him to introduce evidence regarding Detective Witt's misconduct during a subsequent interrogation. The woman Witt questioned during this interrogation (which took place about three months after Karen's interrogation) accused him of forcing her to have sex with him. The authorities apparently found some merit to this allegation, for they subjected Witt to departmental discipline following an investigation. Since Witt played a major role in eliciting Karen's consent during her interrogation, and was the principal government witness during the suppression hearing, Cesar hoped to impeach Witt's credibility with evidence of physical abuse in another case. The district court refused to reopen the suppression hearing to permit him to do so, and he challenges that refusal.

Cesar's contention might possibly have had merit under two circumstances. The first would be if, at the suppression hearing, Karen had alleged that Witt mistreated or abused her during her interrogation, Witt denied it, and the district court chose to believe Witt. But that did not happen. Karen made no allegations of physically abusive conduct, and in fact, as noted above, characterized Witt's conversation with her as "gentlemanly." Evidence that Witt forced a witness to have sex with him during a subsequent interrogation is there-

fore of remote significance to an inquiry into the events surrounding Karen's interrogation. The second circumstance would be if Witt's misconduct was of the type that directly called his credibility into question. Cesar makes a vague claim that evidence of Witt's actions would allow Cesar to impeach Witt's credibility, but does not say how. We do not see how such evidence, even assuming its admissibility, bears on Witt's credibility. Accordingly, the district court properly refused to reopen the suppression hearing, and had no reason to conduct an in camera examination of the department's personnel documents regarding Witt.

AFFIRMED.