# ILLINOIS OFFICIAL REPORTS

---

### *People v. Lyons*, 2013 IL App (2d) 120392

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KEVIN LYONS, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-12-0392 |
| Filed | June 10, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a prosecution for possession of child pornography, the trial court's denial of defendant's motion to suppress computer disks his wife gave to the police was upheld, since the record showed the disks were kept in a cabinet in the home defendant shared with his wife and children, defendant's wife, pursuant to *Matlock*, was presumed to have a right of access to the cabinet and its contents, especially in the absence of any directives from or security measures by defendant reserving the cabinet or disks to himself, and her consent to a search of the disks was valid. |
| Decision Under Review | Appeal from the Circuit Court of Kendall County, No. 08-CF-462; the Hon. Grant S. Wegner and the Hon. John A. Barsanti, Judges, presiding. |
| Judgment | Affirmed. |

Counsel on          Ned C. Khan, of Law Offices of Ned C. Khan, of Aurora, for appellant.
    Appeal

                    Eric C. Weis, State's Attorney, of Yorkville (Lawrence M. Bauer and
                    Edward R. Psenicka, both of State's Attorneys Appellate Prosecutor's
                    Office, of counsel), for the People.


Panel               JUSTICE BIRKETT delivered the judgment of the court, with opinion.

                    Justices Zenoff and Hudson concurred in the judgment and opinion.

**OPINION**

¶ 1     Following a bench trial, defendant, Kevin Lyons, was convicted of possession of child pornography. He appeals the denial of his motion to suppress evidence in the form of electronic media that his wife gathered from their home and delivered to the police. For the following reasons, we affirm.

¶ 2                                BACKGROUND

¶ 3     In January 2009, defendant was indicted on multiple counts of possession of child pornography (720 ILCS 5/11-20.1(a)(6) (West 2008)). In March 2009, he filed a motion to suppress "two boxes of miscellaneous computer floppy disks and CD/DVDs" that his wife, Mona Lyons (Lyons), had brought to the police station in October 2008.

¶ 4     The trial court heard the motion on May 4, 2009. Yorkville police sergeant Larry Hilt testified that, on October 27, 2008, Lyons came to the Yorkville police station. At approximately 3 p.m. that day, he spoke with Lyons, who reported she had concerns about defendant. Lyons related that she had expelled defendant from the family home three days earlier. Defendant had been residing with Lyons, Ka. L., their biological daughter, and Ke. L., Lyons' daughter from a different relationship. Lyons told Hilt that she had expelled defendant from the home because Ka. L. had said that defendant touched her inappropriately. Lyons also recounted to Hilt that, approximately one year before her meeting with Hilt, she caught defendant masturbating in their home while at his computer. Defendant was holding three pairs of Ke. L.'s underwear and saying "something about [Ke. L.'s] tight ass and that she wanted him." Lyons was "fairly far away" from the computer but could see that defendant was viewing an image of a "young girl" on the screen as he masturbated and spoke about Ke. L. Hilt noted that Lyons did not say what she believed was the age of the young girl or whether she believed that the image was pornography. Lyons reported that, after she caught defendant, she told him she wanted him to leave. Defendant replied that he would agree to go to counseling. Defendant continued to reside with Lyons. Lyons told Hilt that she

-2-

later expelled defendant after Ka. L. made her accusation.

¶ 5    Hilt further testified that, at the end of the interview, Lyons gave him two boxes containing various floppy disks and DVDs (collectively, disks). Lyons informed him that the disks "all belong[ed] to [defendant]" except for one that might have belonged to Ke. L. According to Hilt, Lyons said that "she didn't have an ownership interest in [the] disks." Later in his testimony, however, Hilt clarified that Lyons never used the phrase "ownership interest." According to Hilt, "the only indication that [he] had regarding ownership of the disks" was that Lyons told him they belonged to defendant. Hilt further indicated that Lyons said that the disks "were stored in a metal cabinet in a family[-]type room" in the family home along with defendant's two computers. Defendant "put in a password [on the computers] so she couldn't use [them]." Lyons did not know the password. Regarding the metal cabinet, Lyons said that defendant "usually kept [it] locked" but that she and defendant each had a key. Lyons told Hilt that she did not know what was on the disks, but that she "didn't want them in her house." Hilt took the two boxes of disks "for safekeeping."

¶ 6    According to Hilt, Lyons said that, on October 25, one day after she expelled defendant from the family home, she obtained an order of protection against him. That same day, defendant contacted the police himself and said he wanted to retrieve his computers from the residence. The police then contacted Lyons and told her that she would have to let defendant have his computers. On October 25, defendant returned to the residence and retrieved various computer hardware, including towers, monitors, and keyboards. According to what Lyons related to Hilt, defendant did not ask for or take any of the disks. Later, on December 10, 2008, defendant's attorney faxed to the police a list of property that he wanted returned. The list described, *inter alia*, disks in a metal cabinet.

¶ 7    Hilt described what he did with the disks following his meeting with Lyons. Hilt put the disks "on the back burner" because he was more concerned with the possibility that defendant sexually molested Ka. L. On November 12, 2008, Hilt began to inspect the contents of the disks. Hilt did not seek a warrant beforehand and had no "information about what was contained on the disks." Hilt further acknowledged that he never informed defendant that the police possessed the disks. Hilt testified as follows as to why he believed he had authority to search the disks:

"Q. Officer, you testified that Mona Lyons gave you consent to search these disks, correct?[1]

A. She did not actually, no.

Q. She did not give you consent?

A. No.

Q. So you just searched these on your own authority, correct?

A. No.

Q. Why did you think you could search them?

A. Because it was my impression that she left them at the police department as

[1]Actually, Hilt had given no such testimony.

-3-

abandoned property.

> Q. Okay. She left them as abandoned property. That's what your belief was?
>
> A. I believe that she gave them to me so they could be searched.
>
> Q. But she never told you that you could search these, correct?
>
> A. Correct.
>
> Q. And she told you that these didn't belong to her, they belonged to [defendant], her husband, correct?
>
> A. Correct."

On November 12, Hilt searched several of the disks but found nothing illegal. That same day, he gave the disks to Yorkville police officer Jon Helland for assistance in searching them. Two days later, Helland informed Hilt that he had found materials resembling child pornography. On November 18, Hilt and Helland obtained a search warrant that simply described the disks Lyons had given Hilt. After searching more of the disks, Hilt and Helland found further materials resembling child pornography. According to Hilt, none of the data on the disks was protected by password. On December 15, 2008, Hilt and Helland obtained a search warrant for defendant's computer hardware. Meanwhile, on December 14, 2008, defendant, by court permission, returned to the family home to retrieve some of his belongings. The police had returned the boxes of disks to the home, and when defendant took possession of the boxes, he was arrested.

¶ 8        Lyons testified next. She stated that, when she met with Hilt on October 27, 2008, she told him that Ka. L. had accused defendant of touching her inappropriately. Lyons also told Hilt of an earlier occasion where she caught defendant "watching pornography on the computer of a young girl" while he was masturbating with Ke. L.'s underwear and "saying something about her tight ass and you want me." Lyons could see that the girl on the screen was young, but was not sure how old she was, and so Lyons was not positive that "it was actually [child] pornography." Lyons told Hilt that she expelled defendant from the family home on October 24 and that, the next day, defendant returned for his computers but retrieved nothing else.

¶ 9        Lyons stated that, at the October 27 meeting, she gave Hilt two boxes of disks. The disks were taken from "a back room [in the family home] that would be considered maybe a family room." Specifically, the disks were stored in a metal cabinet that was normally locked. Lyons and defendant each had a key to the cabinet. Also in the room with the metal cabinet were defendant's two computers. Lyons recalled that she told Hilt that the disks "were [defendant's]."

¶ 10        At the close of evidence, defendant argued that Lyons had no authority to consent to the search of the disks that she brought to Hilt. Further, defendant argued that the police would not have had probable cause to seize and search the disks on their own.

¶ 11        In response, the State argued several theories. In addition to challenging defendant's claims of lack of consent and probable cause, the State argued the alternative theories that defendant abandoned the disks and that the police search of them was justified on community-caretaking grounds.

¶ 12    The trial court made an oral ruling denying the motion to suppress. First, the trial court rejected the theories of abandonment and community caretaking. Second, the court determined that Lyons consented, and had authority to consent, to a search of the disks. Beginning with the predicate finding that "[c]learly, [Lyons] gave the disks to [Hilt] for purposes of searching their content," the court distinguished two issues. First, the court determined that, since Lyons "had a key to the locked cabinet and there were no explicit instructions to not allow anyone into the cabinet," she had "the right to consent to [a] search [of] the cabinet."[2] The court next determined that Lyons "had authority to consent to the search of the disks." The court reasoned:

> "[I]t would appear that the disks were not secured or protected, nor was there evidence presented which would indicate that the defendant had given explicit instructions not to allow anyone to view the disks."

¶ 13    Lastly, the court alternatively found that the police would have had probable cause to seize the disks.

¶ 14    At defendant's bench trial, he renewed his motion to suppress. Lyons testified consistently with her testimony at the suppression hearing. She additionally testified that she did not own a computer in October 2008, that she is "computer illiterate," and that she does not know how to download data from a computer to portable media such as a floppy disk or DVD.

¶ 15    Both Lyons and Hilt testified that, on December 8, 2008, she made, at the behest of the police, a call to defendant to arrange for his retrieval of items left at the house. Hilt recorded the phone conversation, a transcript of which was admitted into evidence at trial. During the conversation, Lyons offered to gather items for defendant to take when he arrived. Defendant told Lyons he wanted the "disks" and also declared that "almost everything in the cabinet" belonged to him.

¶ 16    During his testimony, Hilt was asked whether the December 8 conversation was the first mention he heard of a metal cabinet where the disks were stored. Hilt believed that Lyons might have mentioned the metal cabinet when he first spoke with her in October 2008. Hilt was then shown his police reports in the case, and he admitted that the metal cabinet was first mentioned in association with the December 8 conversation. Hilt admitted that, if Lyons had told him earlier about the cabinet, he "probably" would have recorded her statement in his reports, as it would have been "an important fact."

¶ 17    Based on Hilt's admissions at trial, defendant argued that, when Hilt received the disks from Lyons (in October 2008) and later searched them (in November 2008), he did not have information to suggest that Lyons had authority to consent to a search of the disks. The trial court denied the renewed motion to suppress.

¶ 18    Following the remainder of the evidence, the court convicted defendant of possession of child pornography. He filed this timely appeal.

---

[2]There was no actual police search of the cabinet. Apparently, the trial court was analyzing whether Lyons had authority both to take the disks from the cabinet and to consent to their search.

¶ 19                                    ANALYSIS

¶ 20      Defendant challenges, on several grounds, the trial court's denial of his motion to suppress. We employ a bifurcated standard in reviewing a ruling on a motion to suppress. *People v. Clendenin*, 238 Ill. 2d 302, 328 (2010). The trial court's factual findings will be sustained unless they are against the manifest weight of the evidence. *Id.* "The reviewing court then assesses the established facts in relation to the issues presented and may draw its own conclusions in deciding what relief, if any, should be granted." *Id.* Accordingly, we review *de novo* the ultimate legal question of whether suppression is warranted. *Id.*

¶ 21      The State raises the threshold issue of whether the constitutional restriction on searches and seizures was even implicated here. Both the fourth amendment to the United States Constitution and article I, section 6, of the Illinois Constitution protect citizens from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. The State asserts that "it cannot be argued that [Lyons] was acting as an agent for the police when she collected the disks and turned them over to the police." The State cites authorities stemming from *Coolidge v. New Hampshire*, 403 U.S. 443 (1971), and holding that, where a private individual, not "act[ing] as an 'instrument' or agent of the state" (*id.* at 487) delivers evidence to the police, there has been no seizure under the fourth amendment. We agree that Lyons was not acting as an agent of the State when she delivered the disks to the police. If, then, the incriminating nature of the disks had been immediately apparent to the police, no justification would have been needed for further police action with respect to them. See *Commonwealth v. Harris*, 817 A.2d 1033, 1048 (Pa. 2003) (the police's reading of letters delivered by a private individual did not constitute a search implicating the fourth amendment). The import of the disks was not obvious, however, but rather the police employed technology to discern their contents. If Lyons had searched even one of the disks and told the police that she suspected it contained child pornography, the State might have had a colorable argument that the police search of the disks did not exceed the scope of the prior, private search. See *People v. Phillips*, 215 Ill. 2d 554, 566 (2005) ("the fourth amendment does not prohibit the government from using information discovered by a private search, because the private search has already frustrated any expectation that the information will remain private"; where a private search has already occurred, the question is whether the police search exceeded the scope of the private search); *Rann v. Atchison*, 689 F.3d 832, 836-37 (7th Cir. 2012) (" 'police exceed the scope of a prior private search when they examine a closed container that was not opened by the private searche[r]s unless the police are already substantially certain of what is inside that container based on the statements of the private searche[r]s, their replication of the private search, and their expertise' " (quoting *United States v. Runyan*, 275 F.3d 449, 463 (5th Cir. 2001))). Lyons, however, told Hilt that she did not know what any of the disks contained. Evidently, then, she had not searched the disks herself. As there was no private search, defendant's expectation of privacy in the contents of the disks had not already been frustrated when the police search occurred. Consequently, the police search of the disks implicated the fourth amendment and, therefore, was subject to constitutional restraints.

¶ 22      The trial court determined that the search of the disks was justified by Lyons' consent.

"A well-settled, specific exception to the fourth amendment's warrant requirement is a search conducted pursuant to consent." *People v. Pitman*, 211 Ill. 2d 502, 523 (2004). The State has the burden of proving by a preponderance of the evidence that valid consent was given. *People v. Miller*, 346 Ill. App. 3d 972, 986 (2004).

¶ 23 Defendant argues as an initial matter that Lyons did not, in fact, grant the police permission to search the disks. Hilt testified both that he believed that Lyons left the disks "as abandoned property" and that he believed that "she gave them to [him] so they could be searched." The trial court expressly found that Lyons gave the police the disks so that they could search them. We will disturb this finding of historical fact only if it is against the manifest weight of the evidence. Disputing this finding, defendant states:

"The record is clear that [Hilt] never expressly asked [Lyons] if he could search the computer disks that she gave to him. The record is equally clear that [Lyons] never expressly told [Hilt] that he had permission to search the computer disks. For this search to be deemed valid, the court would have to imply the request to search from [Hilt] and imply the consent to search from [Lyons]."

Defendant cites authority from the Ninth Circuit Court of Appeals holding that, where the police have not specifically requested permission to enter a private dwelling, consent to enter will not be inferred from the defendant's failure to object. See *United States v. Shaibu*, 920 F.2d 1423, 1428 (9th Cir. 1990). This federal precedent is neither binding (*Bowman v. American River Transportation Co.*, 217 Ill. 2d 75, 91-92 (2005)) nor persuasive, as the facts are materially different from this case. We are dealing here not with unsolicited police entry into a private dwelling, but with a purely voluntary delivery of items to the police. Not only has defendant cited no apposite authority, but the pertinent authority cited by the State defeats his claim. See *People v. McCracken*, 30 Ill. 2d 425, 429 (1964) ("when defendant willingly handed over the articles to the officer at his request[,] this action implied consent to the examination [by the police]"). Accordingly, we will not disturb the trial court's finding that Lyons in fact granted the police permission to search the disks.

¶ 24 Next, defendant argues that Lyons had no authority to consent to a search of the disks. The State relies, as did the trial court, on the concept of "common authority." In *United States v. Matlock*, 415 U.S. 164, 171 (1974), the United States Supreme Court held that "when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." The Court explained that common authority is

"not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements [citations] but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Id.* at 171 n.7.

Common authority may be actual or apparent. *Miller*, 346 Ill. App. 3d at 985. In assessing whether apparent authority exists, the court determines "whether the circumstances known to the police at the time of the entry or opening would warrant a person of reasonable caution in the belief that the consenting party had authority over the premises or effects." *Id.* at 986 (citing *Illinois v. Rodriguez*, 497 U.S. 177, 188-89 (1990)). Defendant claims that Hilt's testimony at trial calls into question whether he or Helland knew, before their search of the disks, that Lyons had acquired them from a cabinet to which she and defendant both had access. Hilt's trial testimony might indeed impact whether Lyons *appeared to him* to have authority to consent to a search of the disks. Lyons herself testified, however, that she did, in fact, have access to the cabinet. In discussing the issue of consent, the trial court appeared to rely on the relationship it found to have actually existed between Lyons and defendant and his possessions. The court did not distinguish actual from apparent authority. On our reading of its analysis, the court found actual authority and did not address the issue of apparent authority. Inasmuch as we uphold the finding of actual authority, we need not, and will not, address whether apparent authority existed.

¶ 25     In explaining why we uphold the finding of actual authority, we begin with an important point that defendant raises on the issue of third-party consent: common authority over an area does not necessarily include authority over closed containers within that area. For this proposition, defendant cites *Miller*, which derived it from a concurring opinion in *United States v. Karo*, 468 U.S. 705, 724 (1984) (O'Connor, J., concurring in part and concurring in the judgment, joined by Rehnquist, J.): "A homeowner's consent to a search of the home may not be effective consent to a search of a closed object inside the home." In *Miller*, the defendant was the house guest of Michael DeMong, who owned the house but resided elsewhere. DeMong permitted the defendant to store items in a cabinet that DeMong himself was using for some of his possessions. DeMong secured the cabinet with a padlock and provided the defendant the only two keys to the cabinet. When DeMong wished to access the cabinet, he would pry it open or ask the defendant to open it for him. *Miller*, 346 Ill. App. 3d at 976. One day, DeMong reported to the police that he had seen contraband inside the cabinet. The police followed DeMong to the house and, with his consent, forcibly opened the cabinet. Inside, the police found a closed duffel bag, which DeMong immediately identified as belonging to the defendant. The police opened the bag and found contraband within. *Id.* at 976, 983.

¶ 26     The appellate court held that, though DeMong had access to the cabinet, he lacked actual or apparent authority to consent to a search of the duffel bag. The court cited the principle from the *Karo* concurring opinion, contextualizing it as follows: "[W]hen a guest in a private home has a private container to which the homeowner has no right of access, the homeowner lacks the power to give effective consent to a search of the closed container." *Id.* at 986. The court went on:

"DeMong did not have actual authority to consent to a search of the duffel bag. *** The State presented absolutely no proof whatsoever that defendant actually conferred upon DeMong 'joint access or control' over the duffel bag. To the contrary, when the police opened the locked storage cabinet and found the duffel bag, DeMong disavowed any ownership interest in the bag, informing the police that the bag belonged to

defendant. [Citation.]

In addition, the State failed to demonstrate that DeMong had apparent authority to consent to a search of the duffel bag. *** If the facts available to the officers at the time of the search would not warrant a person of reasonable caution in the belief that the consenting party had authority over the object sought to be inspected, then warrantless entry without further inquiry is unlawful unless authority actually exists. [Citation.] *** As soon as DeMong informed police that the bag was not his, it was incumbent upon the officers to make further inquiry into whether DeMong had 'common authority' over the duffel bag. The officers did not make this inquiry. The officers did not ask DeMong whether he stored any possessions in the duffel bag or made use of the duffel bag for any purpose. [Citation.] Accordingly, we find that the State failed to sustain its burden of demonstrating that DeMong had apparent authority to consent to a search of the duffel bag found in the storage locker." *Id.* at 987-88.

¶ 27 Defendant relies on the following factual similarities between *Miller* and the present case. In both cases, the consenting party and the defendant shared access to a space (a cabinet), and the police searched a container that was either currently located within that space or previously retrieved from it by the consenting party. In both cases, the consenting party informed the police, prior to the search, that the container did not belong to him or her. *Miller* is not controlling here, however. The more pertinent cases are those in which the consenting party and the defendant are spouses or unmarried cohabitants.

¶ 28 We begin with the Supreme Court's decision in *Matlock*. The defendant in *Matlock* was arrested on the front lawn of a house. The police believed that he was living in the house, but did not ask his consent to enter. Rather, the police went to the front door and were greeted by Gayle Graff, who resided in the house with the defendant and several others. Graff "consented voluntarily to the search of the house, including the east bedroom on the second floor which she said was jointly occupied by [the defendant] and herself." *Matlock*, 415 U.S. at 166. The police searched the east bedroom on the second floor and found "$4,995 in cash *** in a diaper bag in the only closet in the room." *Id.* at 166-67. There was evidence at the suppression hearing that the defendant and Graff had resided together for months before the search, that they had held themselves out as husband and wife, and that when the police searched the bedroom they found items used by males and females. *Id.* at 168-69. The trial court ruled some of this evidence inadmissible and suppressed the money seized from the bedroom. *Id.* at 167-68. The Court reversed the evidentiary rulings and remanded the case for the trial court to consider the suppression motion in light of the admissible evidence. *Id.* at 177-78. The Court commented, however, that, based on the admissible evidence, the prosecution sustained its burden of proving that Graff had actual authority to consent to a search of the diaper bag in the closet. *Id.* at 177.[3]

¶ 29 *Matlock* was cited by our supreme court in *People v. Stacey*, 58 Ill. 2d 83, 85-86 (1974), the facts of which the court succinctly stated as follows:

---

[3]The Court commented that it need not consider the issue of Graff's apparent authority to consent. *Id.* at 177 n.14.

"Mrs. Todd was murdered on November 22, 1957. Defendant was a photographer who had an appointment to photograph Mrs. Todd's baby at her home. The police arrested the defendant in his home at about 9 p.m. the same evening and, after questioning him, noticed scratches on his arm, his nose and a spot of blood on his undershirt. Police officers were then sent to the defendant's home to obtain the shirt he had been wearing that day. At the hearing on the motion to suppress, the defendant's wife testified that her husband had changed shirts during the day and that during the evening he had informed her that the shirt 'is in the bottom drawer.' After the police had taken the defendant to the police station she went into their bedroom, took the shirt from the bottom drawer of the dresser, looked at it and then put it back in the drawer. Later when her father came to their apartment she again took the shirt from the bottom drawer and showed it to him. Her father told her that she should not let her mother take the shirt to be washed with the other clothes because it might have something to do with what the police were talking to the defendant about. When the policemen asked her for the shirt she went to the bedroom and obtained the shirt from the bottom dresser drawer and gave it to them. The policemen did not go into the bedroom."

¶ 30 The court held that the evidence established that the defendant's wife had common authority over the bedroom, including the dresser drawer from which she took the shirt:

"Although the evidence shows that the bottom dresser drawer from which the shirt was taken was used by the defendant alone, the dresser was located in the bedroom mutually used by the defendant and his wife. Instead of establishing limited access to and control of the bedroom, the dresser, or the bottom drawer of the dresser, the evidence establishes a mutual use and control of the room and its equipment and the wife's right of access to the bottom dresser drawer. The dresser was not locked and the wife was not instructed not to look into the drawer. To the contrary, the defendant told his wife that the shirt was in the bottom drawer, and her conduct in opening the drawer, looking at the shirt, returning it, and then subsequently again removing it from the drawer to show it to her father and again returning it, indicates that she had free access to this drawer. The mere fact that the defendant alone may have used this dresser drawer while his wife may have used another or another dresser does not indicate that the wife was denied the mutual use, access to or control of the drawer.

*** [W]e must hold that in view of the mutual use of the bedroom, the wife's right to access the dresser drawer located in that room, the defendant's disclosure to his wife that the shirt was in the drawer and his lack of instruction denying her and others access to the drawer, the defendant clearly assumed the risk that his wife would consent to a search of the room, including the bottom dresser drawer from which the blood-stained shirt was taken." *Id.* at 89-90.

¶ 31 For purposes of comparing the present case to *Matlock*, *Stacey*, and *Miller*, we view the disks as "containers" analogous to the diaper bag in *Matlock*, the dresser drawer in *Stacey*, and the duffel bag in *Miller*. We note that the starting principle in *Miller* (the case on which defendant relies) was that, on the question of third-party consent, control over a space does not necessarily translate to control over discrete containers within that space. The court in *Miller* had proof that DeMong, the consenting party, had access to the cabinet, but the court

would not thereby presume that DeMong had authority over the duffel bag inside. Rather, the court required independent proof that DeMong had authority over the bag. Not only did the State fail to produce evidence that DeMong's control extended to the duffel bag, but there was positive evidence that the bag did not belong to DeMong. In *Matlock*, by contrast, the Court did apply a presumption of authority and control. The Court believed that sufficient evidence of Graff's authority over the containers within the bedroom closet lay in the fact that she and Graff were cohabitants (holding themselves out as husband and wife) who shared the bedroom. The Court required no further proof to justify the police search of the diaper bag within the bedroom closet.

¶ 32    Professor Wayne R. LaFave interprets our supreme court's decision in *Stacey* as following "the *Matlock* assumption of risk approach," under which "the question is not whether the object seized was a personal effect of the nonconsenting spouse, but rather whether the object was kept in a place devoted to his exclusive use." 4 Wayne R. LaFave, Search and Seizure § 8.4(a), at 261-62 (5th ed. 2012). Moreover, "the requisite exclusive use is not established by the mere fact that only the other spouse had theretofore made it a practice to use the particular area searched; something more specific by way of a showing that the consenting spouse was denied access is required." *Id.* at 262; see *United States v. Duran*, 957 F.2d 499, 505 (7th Cir. 1992) ("a spouse presumptively has authority to consent to a search of all areas of the homestead; the nonconsenting spouse may rebut this presumption only by showing that the consenting spouse was denied access to the particular area searched"). The Seventh Circuit Court of Appeals has suggested that it is the intimacy of the marital relationship that justifies a presumption of common authority that is not appropriate in the case of mere roommates or house guests (*e.g.*, the *Miller* case). See *Duran*, 957 F.2d at 504-05. (Of course, from *Matlock* we see that the presumption is appropriate in the case of certain unmarried cohabitants.)

¶ 33    We agree with Professor LaFave that *Stacey* employs the *Matlock* presumption. Under Illinois law, proof that spouses have common authority over a space is, without more, rebuttable proof that each spouse has authority not only over containers within that space that are jointly owned or used by the spouses, but also over containers owned or in practice used by one spouse alone. The presumption does not require the State to prove that the spouse who solely owns or uses the container has specifically authorized the other spouse to access it; the presumption arises simply from the fact of common authority over the space itself.

¶ 34    Our interpretation of *Stacey* is guided by the fact that, when the case was decided, the supreme court followed the "limited lockstep" approach to constitutional search-and-seizure questions, which it still follows to this day. See *People v. Caballes*, 221 Ill. 2d 282, 292 (2006) (the limited lockstep approach "has deep roots in Illinois and was firmly in place before the adoption of the 1970 constitution"); *People v. Williams*, 27 Ill. 2d 542, 544 (1963) ("Even before the Supreme Court's decision that the provisions of the fourth amendment apply to the States under the fourteenth amendment [citation], this court had followed the Supreme Court decisions interpreting the fourth amendment in our interpretation *** of the Illinois constitution. [Citation.] We continue to follow its decisions interpreting the fourth amendment as to what are reasonable searches and seizures."). On search-and-seizure questions, our supreme court will construe our state constitution as affording greater

-11-

protections than the federal constitution only if it " 'find[s] in the language of our constitution, or in the debates and the committee reports of the constitutional convention, something which will indicate that the provisions of our constitution are intended to be construed differently than are similar provisions in the Federal Constitution, after which they are patterned.' " *Caballes*, 221 Ill. 2d at 310 (quoting *People v. Tisler*, 103 Ill. 2d 226, 245 (1984)).

¶ 35   In *Stacey*, the court began with the uncontroverted fact that the defendant shared the bedroom with his wife. *Stacey*, 58 Ill. 2d at 89. The court further found that the wife's access was not limited in any way, but that she had a "right of access to the bottom dresser drawer" (the "container" at issue). *Id.* The court gave its reasons:

> "The dresser was not locked and the wife was not instructed not to look into the drawer. To the contrary, the defendant told his wife that the shirt was in the bottom drawer, and her conduct in opening the drawer, looking at the shirt, [and] returning it *** , indicates that she had free access to this drawer." *Id.* at 89-90.

The court proceeded to conclude that, in light of (1) the wife's joint use of the bedroom with the defendant, (2) the "lack of instruction denying her and others access to the drawer," and (3) the "defendant's disclosure to his wife that the shirt was in the drawer," the defendant "clearly assumed the risk that his wife would consent to a search of the room, including the bottom dresser drawer from which the blood-stained shirt was taken." *Id.* at 90. In the present case, by contrast, there is no evidence that defendant informed Lyons what data was on the disks or that Lyons had accessed the contents of the disks. The question, then, is whether, in *Stacey*, the defendant's disclosure to the wife of the location of the shirt, and her later retrieval and return of it, were integral to the holding, or whether it was sufficient that the defendant had not denied his wife and others access to the drawer. This question will decide whether it was sufficient here that defendant neither directed Lyons *not* to inspect the disks nor took precautions to bar her access.

¶ 36   We do not read *Stacey* as departing from the *Matlock* presumption that, where spouses have common authority over a space, they have common authority over all containers within that space. First, the court's discussion of *Matlock* betrayed no such inclination; the court made no suggestion, nor cited any evidence, that the Illinois constitution demanded stricter proof of consent to search than the federal constitution. Moreover, the court's first observation regarding the dresser drawer was that "[t]he dresser was not locked and the wife was not instructed not to look into the drawer" (*Stacey*, 58 Ill. 2d at 89). We take this as a comment on the absence of evidence that access to the drawer was restricted, and hence that the *Matlock* presumption was not overcome. Of course, the court went on to note positive evidence that the wife was in fact granted access to the drawer, but we view this as but a comment that the State exceeded the proof needed–that not only was the *Matlock* presumption unrebutted, but the wife's right of access to the drawer was affirmatively demonstrated. Therefore, we hold that *Stacey* construed Illinois constitutional protections in lockstep with Supreme Court precedent, and so endorsed the *Matlock* presumption that a spouse's right of access to a space includes the right to access all containers within that space.

-12-

¶ 37    Applying the *Matlock*/*Stacey* principles, we note that defendant and Lyons had mutual access to the metal cabinet as each had a key. Lyons' access to the cabinet was understood during her December 2008 phone conversation with defendant, in which he accepted her offer to gather materials from the cabinet for him to pick up at a later date. That Lyons might not have used the cabinet herself is inconsequential. We are concerned with right of access, not regularity of use, and hold that Lyons had common authority over the cabinet. This gave rise to the *Matlock*/*Stacey* presumption that Lyons had common authority over the disks inside. Defendant did not rebut this presumption. First, he points to Lyons' acknowledgment that the disks "belong[ed]" to him. In the case of spouses (and unmarried cohabitants (*Matlock*)), proof of sole ownership or use of a container by the nonconsenting spouse does not alone overcome the presumption of common authority. See *People v. Ford*, 83 Ill. App. 3d 57, 63 (1980) (wife had common authority over husband's toolbox; "[t]he mere fact that the defendant alone may have used [the] tools does not indicate that his wife was denied the mutual use [of], access to, or control over them"). Second, defendant maintains that, by protecting the household computers with passwords that he did not share with Lyons, he sufficiently manifested an intent that she not access the disks. This is unpersuasive. Defendant must have known that computers are prevalent in today's society and that Lyons could have taken the disks to friends, family, or a public library for viewing. The passwords on the computers were not a meaningful restriction on Lyons' access to the disks' contents, and are more sensibly seen as a means of protecting the information on the hardware itself.

¶ 38    Since, then, Lyons had access to the cabinet containing the disks, and defendant did not restrict her access to the contents of the disks, whether by security measures or directives to her, defendant assumed the risk that Lyons would view the disks herself or permit another to do so. Lyons, therefore, had authority to consent to a search of the disks.

¶ 39    Defendant cites *People v. Elders*, 63 Ill. App. 3d 554 (1978), which was decided by the Fifth District Appellate Court. In *Elders*, the defendant's wife went to the police station and reported that the defendant was drunk and had threatened her with a rifle, and that she was afraid for her son whom she had left home alone with the defendant. The police accompanied the wife to the trailer home she shared with the defendant. After persuading the defendant to exit the home, the police entered and found a rifle inside. *Id.* at 555. They then asked the wife if the defendant had any other weapons, and she replied that "there might be one in his car parked near the trailer." *Id.* The police asked for permission to search the car, and the wife said, " 'Go ahead.' " *Id.* The police recovered a firearm from inside the car. *Id.* The trial court suppressed the firearm, finding that the State made "no showing that [the wife] had any ownership interest in the auto, or any right whatsoever to consent to its search." *Id.* at 558.

¶ 40    On appeal, the State argued "that the fact [the wife] was married to and resided with the defendant gave her authority to consent to a search of the auto without any showing or declaration that she had any actual ownership interest in the vehicle." *Id.* According to the State, "the normal incidents of the marital relationship vest sufficient possessory interests in each spouse in the property of the other such that a warrantless search and seizure consented to by one spouse is operative against the other." *Id.* Citing *Matlock* and *Stacey*, the court disagreed:

"It is only where the record affirmatively establishes 'joint occupancy' or 'equal rights

-13-

to possession' that one spouse's consent to a search is binding against the other. [Citations.] The instant record fails to establish that Mrs. Elders possessed joint control or a right to access to the automobile which she consented to be searched. Contrary to the State's assertion, we do not interpret [*Matlock* and *Stacey*] to create a presumption that the mere existence of a marital relationship standing alone vests in each spouse the requisite 'common authority' announced in *Matlock* necessary to validate one spouse's consent to a warrantless search against the other nonconsenting spouse with whom the authority is shared." (Emphasis added.) *Id.* at 558.

The court in *Elders* was not prepared to presume, from the fact of marriage alone, that the wife had common authority over the defendant's car. Evidently, the court believed that *Matlock* and *Stacey* were distinguishable because they involved areas inside marital dwellings. The case at hand likewise involves an area inside the marital dwelling. Putting aside the question of whether different presumptions ought to apply to cars than to marital dwellings, there is proof here that Lyons possessed a key to the cabinet. Moreover, her ability to access the cabinet was assumed in her December 2008 phone conversation with defendant, where she agreed to gather materials from the cabinet.

¶ 41    We distinguish as well *People v. Blair*, 321 Ill. App. 3d 373, 381 (2001), where the Third District Appellate Court reversed the trial court's order denying the defendant's motion to suppress his computer, which police had taken from his bedroom in his parents' home. While the defendant was in custody for disorderly conduct in connection with videotaping young children at a zoo, the police went to his parents' home. The father gave the police permission to enter the house and to search the defendant's belongings. The police came upon a computer, which the father said belonged to the defendant. The police switched the computer on and found evidence that the defendant had visited sites displaying child pornography. With the father's permission, the police took the computer to the station where, upon closer inspection, they discovered child pornography. *Id.* at 375-76.

¶ 42    After determining that the police lacked probable cause to seize the computer, the appellate court examined whether the father gave valid consent to seize the computer. The court held as a general rule that, while a third party can give valid consent to a *search* of another's property, the third party cannot give valid consent to a *seizure* of that property unless he or she has an ownership interest in it:

"The rationale for third-party consent searches resting, as it does, upon the diminished expectation of privacy attending a third party's common authority over the premises or effects to be searched does not provide a sufficient basis for a third party's consent to the seizure of another's personal effects. While one who permits a third party access or control over his property has a diminished expectation of privacy, the third party's access or control does not similarly diminish the owner's expectation that he will retain possession of his property.

A third party having common authority over premises or effects may permit a search of the premises or effects in his own right. [*Matlock*, 415 U.S. 164.] In such a case, the third party is permitting others to do no more than the third party may do on his own, *i.e.*, inspect the premises or effects. However, a third party may not in his own right consent

to depriving the owner of possession of his property. The third party could not in his own right lawfully exclude the owner from possession of the property. Accordingly, the third party cannot permit others to do what he himself has no right to do.

Therefore, we hold that the consent of a third party is ineffective to permit the government to seize property in which the third party has no actual or apparent ownership interest. Rather, a seizure is lawful only when the owner of the property consents to the seizure, there is a valid warrant for its seizure, or police are lawfully present and there is probable cause to believe the property is contraband, stolen property, or evidence of a crime." *Id.* at 379-80.

Without judging the soundness of this rule, we note that the present case does not fall under it. By the time the police took possession of the disks, Lyons had already frustrated defendant's expectation of possession of the disks (though not his expectation of privacy in their contents, as she had not searched them herself). As we noted earlier, the fourth amendment is not implicated when a private citizen, acting on her own initiative, delivers another's property to the police. See *supra* ¶ 21.

¶ 43 We conclude that, because defendant did not reserve for himself either the metal cabinet or the disks inside, whether by security measures or directives to Lyons, she had common authority over the disks and, therefore, could consent to their search.

¶ 44 As we conclude that Lyons gave valid consent to the search of the disks, we need not consider alternative bases proposed by the State for affirming the trial court's judgment denying the motion to suppress.

¶ 45 For the foregoing reasons, we affirm the judgment of the trial court denying defendant's motion to suppress.

¶ 46 Affirmed.